864 F.2d 1309
 57 USLW 2371, 51 Ed. Law Rep. 92
 Darcy L. SCHAILL, by next friend, William and Mary KROSS,
and Shelley M. Johnson, by next friend, Donald C.
Johnson, Plaintiffs-Appellants,
v.
TIPPECANOE COUNTY SCHOOL CORPORATION, et al., Defendants-Appellees.
 No. 88-1288.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 20, 1988.
Decided Dec. 14, 1988.
As Amended on Denial of Rehearing Feb. 14, 1989.
 
 Richard A. Waples, Ind. Civil Liberties Union, Indianapolis, Ind., for plaintiffs-appellants.
 James V. McGlone, Stuart & Branigan, Lafayette, Ind., for defendants-appellees.
 Before BAUER, Chief Judge, and CUDAHY and MANION, Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 In this action brought under 42 U.S.C. section 1983, plaintiffs-appellants Darcy Schaill and Shelley Johnson challenge a random urinalysis program instituted by the defendant-appellee Tippecanoe County School Corporation ("TSC"). Appellants allege that the TSC urinalysis program violates their rights under the fourth amendment and the due process clause of the fourteenth amendment. After conducting a trial on the merits of appellants' claims, the district court ruled that the TSC program was constitutional. We affirm.
 
 I.
 
 2
 The essential facts of this case are undisputed, and can be stated quite briefly. TSC operates Harrison and McCutcheon High Schools in Indiana. In the spring of 1986, based on information concerning possible drug use by athletes on the McCutcheon High School baseball team, the team's coach ordered sixteen team members to provide urine samples. Of the sixteen students tested, five students' tests produced positive results for the presence of marijuana. Based on these results, other reports of drug use among participants in the TSC athletic program, and their concern over the high incidence of drug abuse among high school students nationwide, the board of trustees of TSC decided to institute a random urine testing program for interscholastic athletes and cheerleaders in the TSC school system.
 
 
 3
 Under the program, all students desiring to participate in interscholastic athletics and their parent or guardian are required to sign a consent form agreeing to submit to urinalysis if chosen on a random basis. Each student selected for an athletic team is assigned a number. The athletic director and head coach of each athletic team are authorized to institute random urine tests during the athletic season. In order to select individuals to be tested, the number assigned to each athlete is placed in a box, and a single number is drawn.
 
 
 4
 The student selected for testing is accompanied by a school official of the same sex to a bathroom, where the student is provided with an empty specimen bottle. The student is then allowed to enter a lavatory stall and close the door in order to produce a sample. The student is not under direct visual observation while producing the sample; however, the water in the toilet is tinted to prevent the student from substituting water for the sample, the monitor stands outside the stall to listen for normal sounds of urination and the monitor checks the temperature of the sample by hand in order to assure its genuineness.
 
 
 5
 The chain of custody of the sample is designed to insure the accuracy and anonymity of the testing procedure. The sample is sent to a private testing laboratory, where it is initially tested for the presence of controlled substances or performance-enhancing drugs using the enzyme multiplied immunoassay technique ("EMIT"). Any sample which tests positive is then retested using the more accurate, and more expensive, gas chromatography/mass spectrometry ("GC/MS") method.
 
 
 6
 If a sample tests positive under both the EMIT and GC/MS analyses, the student and his or her parent or guardian are informed of the results. They then have the opportunity to have the remaining portion of the sample tested at a laboratory of their choice. The student and his or her parent or guardian may also present the athletic director with any evidence which suggests an innocent explanation for the positive result, such as the fact that the athlete legally takes prescription or over-the-counter medication.
 
 
 7
 Barring a satisfactory explanation, the student is then suspended from participation in a portion of the varsity competitions held during the athletic season. A first positive urinalysis test results in a suspension from 30% of the athletic contests, a second positive results in a 50% suspension, a third positive causes a suspension for a full calendar year and a fourth positive results in the student's being barred from all interscholastic athletic competitions during the remainder of the student's high school career. No other penalties are imposed, and a student may decrease the specified punishment by participating in an approved drug counselling program.
 
 
 8
 In the spring of 1987, appellants Darcy Schaill and Shelley Johnson were 15-year-old sophomores at Harrison High School. Shelley had been a member of the varsity swim team as a freshman. Both appellants attended an organizational meeting for students desiring to participate in interscholastic athletics in the fall of 1987, at which time they were first informed of the proposed implementation of the TSC urinalysis program. Both appellants were offended by the thought of having to undergo urinalysis as a condition of participation in interscholastic athletics, and both decided that they would forego the opportunity to compete in interscholastic athletics if required to sign a form consenting to random urine testing.
 
 
 9
 TSC adopted the current version of its drug testing program on August 28, 1987. Appellants had filed their complaint, which initially challenged a prior version of the program, on August 25, 1987. The district court conducted a trial on the merits of appellants' fourth amendment and due process claims on December 7 and 8, 1987. On February 1, 1988, the district court entered its memorandum opinion and order denying appellants' claims for declaratory and injunctive relief. Schaill v. Tippecanoe Cty. School Corp., 679 F.Supp. 833 (N.D.Ind.1988). This appeal followed.
 
 II.
 
 10
 As a threshold matter, we must consider whether TSC's random urine testing program involves a "search" as that term is employed in the fourth amendment. The Supreme Court has held that "[a] 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984); see also Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring).
 
 
 11
 There can be little doubt that a person engaging in the act of urination possesses a reasonable expectation of privacy as to that act, and as to the urine which is excreted. In our society, it is expected that urination be performed in private, that urine be disposed of in private and that the act, if mentioned at all, be described in euphemistic terms. See Lovvorn v. City of Chattanooga, 846 F.2d 1539, 1543 (6th Cir.1988) ("There are few other times where individuals insist as strongly and universally that they be let alone to act in private."); National Treasury Employees Union v. Von Raab, 816 F.2d 170, 175-76 (5th Cir.1987) ("There are few activities in our society more personal or private than the passing of urine."), cert. granted, --- U.S. ----, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988); Capua v. City of Plainfield, 643 F.Supp. 1507, 1513 (D.N.J.1986) ("Urine ... is normally discharged and disposed of under circumstances that merit protection from arbitrary interference.").
 
 
 12
 The fact that urine is voluntarily discharged from the body and treated as a waste product does not eliminate the expectation of privacy which an individual possesses in his or her urine. While urine is excreted from the body, it is not "knowingly expose[d] to the public," Katz, 389 U.S. at 351, 88 S.Ct. at 511; instead, the highly private manner by which an individual disposes of his or her urine demonstrates that it is not intended to be inspected or examined by anyone. Compare California v. Greenwood, --- U.S. ----, 108 S.Ct. 1625, 1629, 100 L.Ed.2d 30 (1988) (individual has no reasonable expectation of privacy in garbage bags left on public street for collection, since garbage was deposited at curbside "for the express purpose of having strangers take it" for ultimate disposal).[1]
 
 
 13
 It is not clear whether, or to what extent, the TSC random urinalysis program's status as a search is affected by the fact that tests will be performed only with respect to students who have previously given their consent. Cf. Lovvorn v. City of Chattanooga, 846 F.2d 1539, 1553-54 (6th Cir.1988) (Guy, J., dissenting) (citing Wyman v. James, 400 U.S. 309, 317-18, 91 S.Ct. 381, 385-86, 27 L.Ed.2d 408 (1971)). The consent provided in the forms supplied to students is certainly not dispositive of the "search" issue since execution of a consent form is a prerequisite to participation in interscholastic athletics. In fact the Supreme Court has recognized that
 
 
 14
 even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interest.... For if the government could deny a benefit to a person because of his [exercise of] constitutionally protected [rights], his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which [it] could not command directly." Speiser v. Randall, 357 U.S. 513, 526, [78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958) ]. Such interference with constitutional rights is impermissible.
 
 
 15
 Perry v. Sinderman, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972).[2] It is certainly relevant to the ultimate question of constitutionality, however, that the activity to which random testing is attached is participation in an extracurricular activity. Random testing is not, as we discuss later, a condition of a weightier benefit such as employment or school attendance. Nonetheless, since participation in interscholastic athletics is expressly conditioned on a student's waiver of his or her fourth amendment rights, the "voluntariness" of a student's submission to urinalysis testing does not alone dispose of the constitutional issues presented by appellants. We must therefore decide whether the searches contemplated by TSC in this case violate the fourth amendment.
 
 III.
 
 16
 Having determined that urine testing constitutes a "search" in the constitutional sense, we must consider what level of suspicion is required to authorize urinalysis of any particular student. Appellants first argue that individual student's urine may not be tested unless TSC officials have probable cause to believe that the particular student has consumed the drugs which the test is designed to detect, and have obtained a warrant authorizing the test from a neutral and detached judicial officer.
 
 
 17
 Determining the level of suspicion required before the government may conduct a search requires "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983).[3] Unfortunately for appellants, we believe that the Supreme Court has already struck the appropriate balance in the context of school searches, and has determined that the probable cause and warrant requirements do not apply.
 
 
 18
 In New Jersey v. T.L.O., 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), a school official searched a student's purse, based on a reasonable suspicion that the student had been smoking on school grounds, in violation of school rules. After noting that the opening of T.L.O.'s purse was "undoubtedly a severe violation of subjective expectations of privacy," id. at 338, 105 S.Ct. at 741, the Court canvassed the legitimate governmental interests which were furthered by the search. The Court observed that " '[e]vents calling for discipline are frequent occurrences and sometimes require immediate, effective action,' " id. at 339, 105 S.Ct. at 741; further, the particular demands of the school environment required that teachers have resort to "swift and informal disciplinary procedures." Id. at 340, 105 S.Ct. at 742. The Court therefore held that the warrant and probable cause requirements did not apply; instead, school searches should be judged under the standard of "reasonableness[ ] under all the circumstances." Id. at 341, 105 S.Ct. at 742. The Court noted that this standard would "spare teachers and school administrators the necessity of schooling themselves in the niceties of probable cause and permit them to regulate their conduct according to the dictates of reason and common sense." Id. at 343, 105 S.Ct. at 743.
 
 
 19
 Similarly, in O'Connor v. Ortega, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987), the Court concluded that government employers were subject to a reasonableness standard when they conducted workplace searches. The plurality opinion stressed that "public employers are not enforcers of the criminal law; instead, public employers have a direct and overriding interest in ensuring that the work of the agency is conducted in a proper and efficient manner." Id. at 724, 107 S.Ct. at 1502. The plurality also noted that "[i]t is simply unrealistic to expect supervisors in most government agencies to learn the subtleties of the probable cause standard." Id. See also Darryl H., 801 F.2d at 902 (reasonableness standard, rather than probable cause, governs visual inspection of unclothed child by social worker investigating claim of child abuse or neglect).
 
 
 20
 To avoid the effect of T.L.O. and O'Connor v. Ortega, appellants suggest that the decisions in those cases were based solely on the need for swift, or even immediate, responses to violations of a school's or employer's rules. Appellants argue that where, as here, a search is authorized well in advance of its execution, there is no "special need" to relax the traditional warrant and probable cause requirements. See T.L.O., 469 U.S. at 351, 105 S.Ct. at 747 (Blackmun, J., concurring in the judgment). We cannot accept appellant's narrow reading of T.L.O. and O'Connor v. Ortega. The Supreme Court's concern was not merely with the time required to establish probable cause or obtain a warrant. Instead, the Court concluded that these fourth amendment requirements, traditionally (though not exclusively) applied to law enforcement investigations, would unnecessarily intrude upon the purposes of the classroom or workplace. For example, in T.L.O. the Court stressed that a school official's primary mission is not to ferret out crime, but is instead to teach students in a safe and secure learning environment. School teachers and administrators should not be required to keep abreast of the most recent developments in fourth amendment jurisprudence; nor should they be required to retain counsel and proceed through the courts each time they desire to obtain further information regarding a potential violation of school rules. It is for this reason that the Court's holding is stated quite broadly: " 'when there are reasonable grounds for suspecting that [a] search will turn up evidence that the student has violated or is violating either the law or the rules of the school,' a search of the student's person or belongings is justified." Id. at 350, 105 S.Ct. at 747 (Powell, J., concurring) (stating the holding of the Court). The Court's holding is in no way qualified to apply only where there is a special requirement of immediate action. Compare id. at 353, 105 S.Ct. at 749 (Blackmun, J., concurring in the judgment) (only "special need for an immediate response" justifies exception to warrant and probable cause requirements for school officials).
 
 
 21
 The Supreme Court has ruled that the probable cause and warrant requirements are not applicable to school searches. We therefore reject appellant's broadest attack against the TSC program.
 
 IV.
 
 22
 Since the probable cause and warrant requirements are not applicable to the searches involved in this case, we must consider the TSC urinalysis program under the general fourth amendment standard of reasonableness. As the Supreme Court recognized in T.L.O., "[t]he fundamental command of the Fourth Amendment is that searches and seizures be reasonable, and although 'both the concept of probable cause and requirement of a warrant bear on the reasonableness of a search, ... in certain limited circumstances neither is required.' " 469 U.S. at 340, 105 S.Ct. at 742 (quoting Almeida-Sanchez v. United States, 413 U.S. 266, 277, 93 S.Ct. 2535, 2541, 37 L.Ed.2d 596 (1973) (Powell, J., concurring)).[4]
 
 
 23
 In the present case, TSC plans to conduct a search not only without probable cause or a warrant, but in the absence of any individualized suspicion of drug use by the students to be tested.[5] In these circumstances, TSC bears a heavier burden to justify its contemplated actions. In a criminal law enforcement context, the Supreme Court has been extremely hesitant to condone searches performed without any articulable basis for suspecting the particular individual of unlawful conduct.[6] However, in several carefully defined situations, the Court has recognized that searches may be conducted in the absence of any grounds to believe that the individual serached has violated the law. The Court has stressed that "[i]n those situations in which the balance of interests precludes insistence upon 'some quantum of individualized suspicion,' other safeguards are generally relied upon to assure that the individual's reasonable expectation of privacy is not 'subject to the discretion of the officer in the field.' " Delaware v. Prouse, 440 U.S. at 654-55, 99 S.Ct. at 1396-97 (footnote omitted).
 
 
 24
 The Supreme Court has held that suspicionless searches of private dwellings and automobiles are consistent with the Fourth Amendment in certain situations. In United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), the Court approved of the warrantless stop and interrogation at fixed checkpoints of the occupants of automobiles travelling on roadways near the border. The Court noted that it would be "impractical" for the government to attempt to develop "reasonable suspicion" of smuggling or transportation of illegal aliens with regard to individual vehicles, due to the heavy traffic flow on the roads where checkpoints were located. Id. at 557, 96 S.Ct. at 3082. Further, a "reasonable suspicion" requirement "would largely eliminate any deterrence to the conduct of well-disguised smuggling operations." Id. Since the checkpoint procedure significantly limited the discretion of the officers conducting the questioning and provided travelers with visible evidence of the questioner's legal authority, the Court also noted that the intrusion into an individual's legitimate expectations of privacy was fairly limited. Id. at 557-59, 96 S.Ct. at 3082-83; see also Delaware v. Prouse, 440 U.S. at 656-57, 99 S.Ct. at 1397-98 (search conducted according to neutral criteria far less intrusive than search apparently conducted at the whim of the searcher). While allowing that "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure," the Court held that "the Fourth Amendment imposes no irreducible requirement of such suspicion." 428 U.S. at 560-61, 96 S.Ct. at 3084-85.
 
 
 25
 Employing a similar analysis, the Court in Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), held that area searches of private dwellings designed to detect housing code violations were constitutional in the absence of any particularized suspicion. The Court placed significant emphasis on the fact that the searches were not "aimed at the discovery of evidence of crime," and that the harmful conditions being investigated were not discoverable by any less intrusive means. Id. at 537, 87 S.Ct. at 1735. Further, under the area warrant procedure involved in that case, the investigating officer's discretion was limited, and the resident would be assured of the officer's authority to conduct the search in question. Id. at 532-33, 87 S.Ct. at 1732-33.
 
 
 26
 Nor has individualized suspicion been required in the so-called "administrative search" cases.[7] In these cases, the Court has approved of warrantless, suspicionless searches of commercial premises operating in certain "heavily regulated industries." The Court has stressed several important factors in approving searches in this context. In industries subject to pervasive regulation, a business owner has a diminished expectation of privacy and has, to some extent, impliedly consented to inspections through his or her voluntary decision to enter a regulated industry. Second, the regulatory scheme which authorizes the search must further substantial governmental interests. Third, warrantless, suspicionless inspections must be necessary to further the regulatory scheme; the government must demonstrate that imposition of a warrant or reasonable suspicion requirement would frustrate the purposes of the regulatory scheme. Finally, the statutory or regulatory program authorizing the warrantless entry must specify the circumstances in which a search is appropriate with such particularity that the business owner is adequately advised that a particular search is lawful and the inspecting officer's discretion is limited sufficiently to guard against the danger of searches instituted primarily for harassment or intimidation.[8]
 
 
 27
 The Supreme Court has also approved of suspicionless searches of impounded items or the personal effects of an arrestee prior to incarceration under the "inventory search" doctrine. In approving these searches the Court has emphasized several factors: the searches were not intended primarily to discover evidence of crime but instead served to protect the police from dangerous instrumentalities and unfounded allegations of theft; the searches were carefully limited in scope and frequency by a regulatory scheme or departmental policy; and the individual whose effects were searched possessed only a minimal expectation of privacy, either because a vehicle was being searched, or because the individual was being lawfully arrested and incarcerated. Colorado v. Bertine, 479 U.S. 367, 107 S.Ct. 738, 741-43, 93 L.Ed.2d 739 (1987); id. at 376, 107 S.Ct. at 744 (Blackmun, J., concurring) (stressing that inventory searches must be conducted "only pursuant to standardized police procedures" and that searches must not be directed at discovering evidence of criminal activity); Illinois v. Lafayette, 462 U.S. 640, 643-48, 103 S.Ct. 2605, 2608-11, 77 L.Ed.2d 65 (1983); South Dakota v. Opperman, 428 U.S. 364, 375-76, 96 S.Ct. 3092, 3100-01, 49 L.Ed.2d 1000 (1976).
 
 
 28
 The preceding discussion highlights several principles which must inform our decision whether the warrantless, suspicionless searches which TSC proposes are consistent with the fourth amendment. First, suspicionless searches are more likely to be permissible in circumstances where an individual has diminished expectations of privacy. An individual's privacy rights vary with the context--whether the individual is at home, at work, in school or in jail, in a car or on a public sidewalk. Further, in certain pursuits, an individual's expectations of privacy are diminished by a past history of significant governmental regulation.
 
 
 29
 Second, the governmental interests furthered by a particular search must be weighty, and generally of a nature that alternate, less intrusive means of detection would not sufficiently serve the government's ends. For example, where unlawful conduct or conditions cannot be detected through other means, a warrantless and suspicionless search may be appropriate. That alternative investigative techniques would not deter unlawful conduct to the same extent as the challenged practice may also be a relevant consideration.
 
 
 30
 The extent to which the examining officer's discretion is limited by the regulatory scheme under which searches are conducted is also an important factor. Confining the enforcement discretion of the officer in the field serves several important functions. First, if individuals are selected for a search based on clearly articulated, objective criteria, the possibility that any particular search is motivated by a desire to harass or intimidate is diminished accordingly. Further, previously enunciated selection criteria assure the individuals searched that the officer is acting in accordance with his or her lawful authority. Objective selection criteria also tend to diminish the subjective intrusiveness of a particular search--the individual is able to understand how and why he or she was selected for search, and need not fear that he or she was "singled out" for improper reasons.
 
 
 31
 Finally, whether or not the search is intended to discover evidence of criminal activity is of critical importance in assessing the validity of warrantless, suspicionless searches. A search conducted for civil or non-punitive purposes may be valid in circumstances where a search conducted as part of a criminal investigation would not be permissible.
 
 
 32
 With the foregoing principles in mind, we turn to a more detailed consideration of the urinalysis program proposed in this case.
 
 A.
 
 33
 In general, there is a substantial expectation of privacy in connection with the act of urination. However, the privacy considerations are somewhat mitigated on the facts before us because the provider of the urine sample enters a closed lavatory stall and the person monitoring the urination stands outside listening for the sounds appropriate to what is taking place. The invasion of privacy is therefore not nearly as severe as would be the case if the monitor were required to observe the subject in the act of urination.
 
 
 34
 We also find great significance in the fact that the drug testing program in this case is being implemented solely with regard to participants in an interscholastic athletic program. In the first place, in athletic programs in general there is a much diminished expectation of privacy and, in particular, privacy with respect to urinalysis. There is an element of "communal undress" inherent in athletic participation, which suggests reduced expectations of privacy. In addition, physical examinations are integral to almost all athletic programs. In fact, athletes and cheerleaders desiring to participate in the TSC athletic program have long been required to produce a urine sample as part of a mandatory medical examination. This sample is not produced under monitored conditions, is only tested for the presence of sugar in the urine and is given to the athlete's physician of choice rather than a school official; however, the fact that such samples are required suggests that legitimate expectations of privacy in this context are diminished.
 
 
 35
 Further, in the case before us, we are dealing with interscholastic athletics. In these programs the Indiana High School Athletic Association has extensive requirements which it imposes upon schools and individuals participating in interscholastic athletics. These include minimum grade, residency and eligibility requirements. In addition to IHSAA regulations, participants in interscholastic athletics are also subject to training rules, including prohibitions on smoking, drinking and drug use both on and off school premises.[9]
 
 
 36
 Perhaps even more demonstrative of the special characteristics of athletics is the high visibility and pervasiveness of drug testing in professional and collegiate athletics in this country and in the Olympic Games. The suspension and disqualification of prominent athletes on the basis of positive urinalysis results has been the subject of intense publicity all over the world. See O'Halloran v. University of Washington, 679 F.Supp. 997, 1005-07 (W.D.Wash.) (discussing widespread urine testing conducted in collegiate and Olympic athletic competitions), rev'd on other grounds, 856 F.2d 1375 (9th Cir.1988).
 
 
 37
 The combination of these factors makes it quite implausible that students competing for positions on an interscholastic athletic team would have strong expectations of privacy with respect to urine tests. We can, of course, appreciate that monitored collection and subsequent testing of urine samples may be distasteful (although plaintiffs' subjective evidence on this point was not powerful), but such procedures can hardly come as a great shock or surprise under present-day circumstances. For this reason, we believe that sports are quite distinguishable from almost any other activity. Random testing of athletes does not necessarily imply random testing of band members or the chess team.[10]
 
 
 38
 We also note that, as in the "administrative search" cases, there is a strong element of "implied consent" involved in the urinalysis program at issue in this case. These plaintiffs and other athletes must, of course, consent to random urine testing for drugs as a condition of participating in interscholastic athletics. As we have noted, this consent in itself does not render these procedures any the less "searches" subject to the fourth amendment. Nonetheless, we must weigh in the balance the fact that these plaintiffs are required to submit to random drug testing only as a condition of participation in an extracurricular activity--athletics.[11] Refusal to submit to these tests will not result in loss of employment, criminal penalties or any academic penalty whatsoever. No student will be suspended or expelled from school. A student who has a positive urinalysis result will not even be denied participation in the athletic program. He or she will merely be refused participation in 30% of the games.[12]
 
 
 39
 Although, therefore, there is certainly a burden on these plaintiffs' right to refuse drug testing, that burden is a light one compared with, for example, cases where drug testing is a condition of employment, promotion or similar job-related interest. Participation in interscholastic athletics is a benefit carrying with it enhanced prestige and status in the student community. It is not unreasonable to couple these benefits with an obligation to undergo drug testing. The fact that students execute consent forms and are fully informed of the manner in which the program will be implemented also provides notice to students that they may be asked to submit to a search. The notice provided by the consent forms significantly diminishes the subjective intrusiveness of the urine testing proposed by TSC. The fact, therefore, that the drug testing involved here is, to the extent indicated, consensual is important to our determination of the constitutionality of the program.[13]
 
 B.
 
 40
 Obviously, TSC's interest in the particular program at issue in this case cannot be gainsaid--in fact, the Supreme Court specifically noted in T.L.O. that drug use by students was one of the "particularly ugly forms" in which school disciplinary problems commonly arise in present-day America. 469 U.S. at 339, 105 S.Ct. at 741. The problem of drug use among the youth of this country continues to be severe and intractable; statistics indicate that, in 1980, 63% of high school seniors in Indiana had tried marijuana and 37% of them used marijuana at least once a week. In a nationwide survey conducted in 1986, 23% of high school seniors reported that they had used marijuana in the preceding month. In the TSC school system itself, urine tests administered to members of the McCutcheon baseball team in the spring of 1986 produced 5 positive results out of 16 students tested. The incidence of drug use revealed by this test, slightly greater than 31%, is consistent with the national and state-wide statistics.[14] Based on this evidence, the district court found that the student athletes involved here used drugs to the same extent as students in the national profile. This is certainly not an established fact, but it is not a wholly unreasonable inference.
 
 
 41
 The harm done by drug usage by student athletes was the subject of a great deal of testimony in the district court and of findings by the trial judge. Judge Sharp found, and there was evidence to support his finding, that the use of drugs presented a particular threat to athletes and cheerleaders. Due to alterations of mood, reductions of motor coordination and changes in the perception of pain attributable to drug use, the health and safety of athletes was particularly threatened. At trial, Jacob Burton, the assistant principal and athletic director at McCutcheon High School, testified to three instances in which athletes had admitted that injuries had been caused or exacerbated by drug impairment during athletic contests. In one instance, a baseball player misjudged a pitch and turned toward the ball, suffering a broken nose as a result.
 
 
 42
 In addition, as Judge Sharp found, "[t]he interscholastic athletes of a public school system typically enjoy a unique identity within the school community.... The student athlete is generally viewed by the broader community with admiration and respect." 679 F.Supp. at 856. Because of their high visibility and leadership roles, it is not unreasonable to single out athletes and cheerleaders for special attention with respect to drug usage. This court may take judicial notice of the fact that in the society at large drug usage by athletes is highly publicized and is a matter of great concern.[15] Drug usage by this widely admired group is likely to affect the behavior of others and school authorities are within their discretion in conducting a program specifically directed at athletes. In addition, of course, the status of the student athlete tends to extend the athlete's relationship to the school beyond the confines of the school day, as Judge Sharp found. 679 F.Supp. at 856.[16] In the special context of school administration, where courts must grant significant weight to the informed exercise of the discretion of school officials, we believe that the evidence supports TSC's determination that drug usage among student athletes is a problem with serious implications for students' health and safety. For these reasons TSC has a substantial interest in enforcement of its proposed random urinalysis program.[17]
 
 
 43
 The record also contains substantial evidence that alternative methods of investigation would not adequately serve the school's interest in detection and deterrence of drug use. While there was some disagreement between plaintiffs' and defendants' experts regarding the efficacy of trained visual observation, neurobehavioral testing, education programs or individualized suspicion urine testing, we believe that the evidence of record fully supported the district court's conclusion that the choice made by TSC was reasonable in the circumstances of this case. Among other things, random testing may be particularly effective as a deterrent. See Transport Workers Union, Local 234 v. Southeastern Penn. Transp. Auth., 678 F.Supp. 543, 550 (E.D.Pa.1988) (alternatives to random urinalysis do not adequately protect state interest in deterring drug usage by operators of public transit system). Again, we must stress that we are reviewing a decision of school administrators as to how best to deal with a serious threat to the school's learning environment. The school's choice of appropriate means to combat this health and disciplinary problem will not be overturned unless unreasonable in light of available alternatives. Having heard the live testimony of numerous witnesses on this point, the trial court's finding that TSC had made a reasonable decision in implementing its urinalysis program is entitled to considerable deference, and we will not upset this conclusion on appeal.
 
 C.
 
 44
 As noted above, where a search is based upon general factors rather than individualized suspicion, there is an additional requirement to sustain the constitutionality of the search. The search program must incorporate adequate safeguards to assure that reasonable expectations of privacy are not "subject to the discretion of the official in the field." We believe that this important requirement is met in this case.
 
 
 45
 The TSC program specifies that athletes will be selected for testing by drawing numbers on a random basis. The officials in charge will not exercise any discretion as to who will be chosen. There are specific provisions for the manner in which the sample is to be obtained, the handling and testing of the sample by a competent laboratory, the confirmation of positive test results and the consequences of confirmed positive results. We also note that students will be fully advised of the manner in which the program will operate when they are initially asked to sign consent forms, and they will be given a copy of the TSC Drug Program. The information provided will eliminate any element of surprise if and when a particular student is selected for testing, and the student will be able to assure him or herself that he or she has been selected for testing in a fair and impartial manner. Further, the use of published selection criteria insures that a student is not stigmatized among his or her peers due to selection for testing. Compare Capua v. City of Plainfield, 643 F.Supp. 1507 (D.N.J.1986) (urinalysis testing found violative of fourth amendment where no prior notice given and no regulations limited search authority of investigators or insured confidentiality of test results).
 
 D.
 
 46
 Finally, we note that the TSC urinalysis program has been instituted in order to enforce the rules of the athletic program and the school. The program is not intended to discover evidence of unlawful activity for use in criminal prosecution.[18] Even in the school setting, the school board has gone to great lengths to emphasize rehabilitation over punishment, as is evidenced both by the progressive nature of the sanctions for a positive test result and by the fact that a student may reduce the length of any suspension imposed by participating in an approved drug counselling program.
 
 E.
 
 47
 The convergence of several important factors convinces us that the searches involved here take place in one of the relatively unusual environments in which suspicionless searches are permissible: interscholastic athletes have diminished expectations of privacy, and have voluntarily chosen to participate in an activity which subjects them to pervasive regulation of off-campus behavior; the school's interest in preserving a drug-free athletic program is substantial, and cannot adequately be furthered by less intrusive measures; the TSC program adequately limits the discretion of the officials performing the search; and the information sought is intended to be used solely for noncriminal educational and rehabilitative purposes. Based on a careful and considered weighing of these factors, we conclude that the TSC urinalysis program does not violate the fourth amendment.[19]V.
 
 
 48
 Appellant's final contention is that the procedures provided in the TSC program for a student to challenge a positive urinalysis test are insufficient under the due process clause of the fourteenth amendment. Under TSC's written guidelines, the athletic director will inform a student and his or her parent or guardian of a positive test result which has been confirmed by gas chromatography/mass spectrometry. The student and parent or guardian then have the opportunity to have a reserved portion of the specimen retested at a laboratory of their choice. The student and parent or guardian will also have an opportunity to offer evidence to the athletic director which may suggest an innocent explanation for the positive result. The athletic director may then consult with a toxicologist to determine whether the proffered explanation could account for a positive result. In sum, the TSC policy provides the student with notice of the charges against him or her, and an opportunity to rebut the charges at a meeting with the school disciplinary authority.
 
 
 49
 We must now consider whether these procedures comport with the requirements of due process. As an initial matter, we note that there is room for doubt whether a student athlete has a constitutionally protected liberty interest in being free of the potential stigma associated with removal from an athletic team.[20] This is especially true where, as here, the plaintiffs have brought a facial challenge to TSC's program. At this point in the implementation of the TSC program, it is highly speculative to assume that the reasons for a student's suspension from athletic competition will become general knowledge, and that the student's reputation will be adversely affected by a suspension. In any event, even assuming that some sort of liberty interest is involved, we believe that the TSC program provides all the process that is due.
 
 
 50
 In Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), the Supreme Court held that a student given a ten-day suspension for disciplinary infractions was entitled to "oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." Id. at 581, 95 S.Ct. at 740. The Court characterized the procedures required by the fourteenth amendment as "rudimentary," amounting only to "an informal give-and-take between student and disciplinarian." Id. at 584, 95 S.Ct. at 741. See also Board of Curators of the Univ. of Missouri v. Horowitz, 435 U.S. 78, 85, 98 S.Ct. 948, 952, 55 L.Ed.2d 124 (1978); Lamb v. Panhandle Community Unit School Dist. No. 2, 826 F.2d 526, 528 (7th Cir.1987) (due process satisfied where "principal and [student] informally discussed the incident shortly after it occurred"). The Court also indicated that the hearing could be conducted before a disciplinarian who "himself has witnessed the conduct forming the basis for the charge." 419 U.S. at 584, 95 S.Ct. at 741. See also Keough v. Tate Cty. Bd. of Educ., 748 F.2d 1077, 1080 (5th Cir.1984) (brief meeting between student and school principal, who had witnessed misconduct forming basis for suspension).
 
 
 51
 Appellants fault the TSC program for placing on the student the burden of proving that the twice-confirmed test result is erroneous, for requiring the student to hire his own toxicologist or testing laboratory to conduct a further evaluation of the TSC urine test and for allowing the athletic director, who was personally involved in the collection, labeling and storage of the initial sample, to serve as the adjudicator of the student's claim that the initial result was erroneous.
 
 
 52
 There was evidence before the district court indicating that TSC's urine testing program, which requires confirmation of any positive result using the gas chromatography/mass spectrometry method, would produce results with a 95% confidence level. Based on this evidence, the district court concluded that the "possible pitfalls involved in EMIT screening have been avoided, as much as possible, by [GC/MS] followup." 679 F.Supp. at 857. Given the high degree of accuracy inhering in TSC's testing procedures, we cannot conclude that the school system has violated the due process clause by placing the burden to disprove a confirmed positive result on the student. Further, after providing a confirmatory test using the most accurate technology available at no cost to the student, TSC cannot be faulted for requiring a student to bear the cost of any further testing which the student may desire to perform. Finally, as to the potential bias or conflict of interest of the athletic director, we note that the Supreme Court in Goss specifically contemplated that a school official with personal knowledge of the grounds for discipline might serve as the hearing officer, consistent with the requirements of due process.
 
 
 53
 Since TSC's drug testing program provides for confirmatory testing at no cost to the student, and provides the student with notice of the results of the test and an opportunity to rebut a positive result, we cannot find that TSC's drug testing program violates the due process clause.[21]
 
 VI.
 
 54
 In our consideration and decision of this case, we have been mindful of the Supreme Court's admonition that public school students "do not shed their constitutional rights ... at the schoolhouse gate." Tinker v. Des Moines Indep. School Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). We are also cognizant of the trenchant observation of Justice Jackson: "That [schools] are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943).
 
 
 55
 However, we recognize that, if students are to be educated at all, an environment conducive to learning must be maintained. The plague of illicit drug use which currently threatens our nation's schools adds a major dimension to the difficulties the schools face in fulfilling their purpose--the education of our children. If the schools are to survive and prosper, school administrators must have reasonable means at their disposal to deter conduct which substantially disrupts the school environment. In this case, we believe that the Tippecanoe County School Corporation has chosen a reasonable and limited response to a serious evil. In formulating its urinalysis program, the school district has been sensitive to the privacy rights of its students, and has sought to emphasize rehabilitation over punishment. We cannot conclude that this approach is inconsistent with the mandates of the Constitution. The judgment of the district court is therefore
 
 
 56
 AFFIRMED.
 
 
 
 [1]
 Finding that an individual's voice and handwriting are " 'physical characteristics' that are 'constantly exposed to the public,' " the Supreme Court has held that the compelled production of a voice or handwriting exemplar is not a "search" within the meaning of the fourth amendment. United States v. Mara, 410 U.S. 19, 21, 93 S.Ct. 774, 775, 35 L.Ed.2d 99 (1973) (handwriting sample); United States v. Dionisio, 410 U.S. 1, 14, 93 S.Ct. 764, 771, 35 L.Ed.2d 67 (1973) (voice exemplar). However, the Supreme Court subsequently held that the removal of scrapings from under an individual's fingernails does constitute a search. Cupp v. Murphy, 412 U.S. 291, 295, 93 S.Ct. 2000, 2003, 36 L.Ed.2d 900 (1973). Lower courts have held, based on the principles of Mara, Dionisio and Cupp, that the taking of pubic hair or breath samples and X-rays infringe on an individual's legitimate expectations of privacy, and therefore constitute searches subject to the requirements of the fourth amendment. See, e.g., Burnett v. Municipality of Anchorage, 806 F.2d 1447, 1449 (9th Cir.1986) (breath analysis); United States v. Vega-Barvo, 729 F.2d 1341 (11th Cir.) (X-ray), cert. denied, 469 U.S. 1088, 105 S.Ct. 597, 83 L.Ed.2d 706 (1984); Bouse v. Bussey, 573 F.2d 548, 550 (9th Cir.1977) (compelled removal of pubic hair sample); Thornburg v. Dora, 677 F.Supp. 581, 586-87 (S.D.Ind.1988) (breath analysis); United States v. Allen, 337 F.Supp. 1041, 1043 (E.D.Pa.1972) (X-ray); State v. Locke, 418 A.2d 843, 846-47 (R.I.1980) (breath analysis). Significantly, the Supreme Court has also held that the detention of an individual until he or she has a bowel movement, and an examination of the matter excreted, constitutes a search. United States v. Montoya de Hernandez, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985); see also United States v. Mosquera-Ramirez, 729 F.2d 1352 (11th Cir.1984). Certainly, the compelled production and examination of an individual's urine cannot be considered less intrusive than the searches involved in these cases
 
 
 [2]
 See also Federal Communications Comm'n v. League of Women Voters, 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984) (government may not prohibit "editorializing" as a condition of financial grants to noncommercial television stations); Regan v. Taxation with Representation, 461 U.S. 540, 545, 103 S.Ct. 1997, 2001, 76 L.Ed.2d 129 (1983) ("The government may not deny a benefit to a person because he exercises a constitutional right."); Shapiro v. Thompson, 394 U.S. 618, 627 n. 6, 89 S.Ct. 1322, 1327 n. 6, 22 L.Ed.2d 600 (1969); Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968); Sherbert v. Verner, 374 U.S. 398, 404-05, 83 S.Ct. 1790, 1794-95, 10 L.Ed.2d 965 (1963); Lovvorn v. City of Chattanooga, 846 F.2d 1539, 1548 (6th Cir.1988); Serpas v. Schmidt, 827 F.2d 23, 29-30 (7th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1075, 99 L.Ed.2d 234 (1988); Blackburn v. Snow, 771 F.2d 556, 568 (1st Cir.1985) (no consent where submission to strip search a precondition of prison visit; "government may not condition access to even a gratuitous benefit or privilege it bestows upon the sacrifice of a constitutional right"); Note, Unconstitutional Conditions, 73 Harv.L.Rev. 1595 (1960); but cf. Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1007, 104 S.Ct. 2862, 2875, 81 L.Ed.2d 815 (1984) (government may condition registration of pesticide on applicant's acquiescence in disclosure of trade secrets, since "pesticide sale and use ... has long been the source of public concern and the subject of government regulation")
 
 
 [3]
 See also O'Connor v. Ortega, 480 U.S. 709, 719 107 S.Ct. 1492, 1499, 94 L.Ed.2d 714 (1987) (plurality opinion); United States v. Montoya de Hernandez, 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 (1985) ("The permissibility of a particular law enforcement practice is judged by 'balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.' "); Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979) (in balancing interests under fourth amendment, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted"); United States v. Martinez-Fuerte, 428 U.S. 543, 555, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976); Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968) (approving "stop and frisk" by police officer based only on reasonable suspicion of criminal activity); Camara v. Municipal Court, 387 U.S. 523, 537, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967) (determining proper standard for particular type of search requires "balancing the need to search against the invasion which the search entails"); Darryl H. v. Coler, 801 F.2d 893, 900 (7th Cir.1986)
 
 
 [4]
 See also Delaware v. Prouse, 440 U.S. 648, 653-54, 99 S.Ct. 1391, 1395-96, 59 L.Ed.2d 660 (1979) ("the essential purpose of the proscriptions of the Fourth Amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials, ... in order 'to safeguard the privacy and security of individuals against arbitrary invasions' ") (footnote omitted); Camara v. Municipal Court, 387 U.S. 523, 539, 87 S.Ct. 1727, 1736, 18 L.Ed.2d 930 (1967) (even in the absence of a warrant requirement, "reasonableness is still the ultimate standard" for determining constitutionality of search)
 
 
 [5]
 In T.L.O. the Supreme Court expressly reserved decision on whether individualized suspicion was always necessary to validate a search under the reasonableness standard adopted in that case. The Court noted that there was no "irreducible requirement" that individualized suspicion be present for a search to be constitutional; it also observed that "[e]xceptions to the requirement of individualized suspicion are generally appropriate only where the privacy interests implicated by a search are minimal and where 'other safeguards' are available 'to assure that the individual's reasonable expectation of privacy is not "subject to the discretion of the official in the field." ' " 469 U.S. at 342 n. 8, 105 S.Ct. at 743 n. 8 (quoting Delaware v. Prouse, 440 U.S. 648, 654-55, 99 S.Ct. 1391, 1396-97, 59 L.Ed.2d 660 (1979)). See also O'Connor v. Ortega, 480 U.S. at 726, 107 S.Ct. at 1503 (refusing to decide whether individualized suspicion always required for workplace search)
 
 
 [6]
 For example, in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which first approved of brief interrogation and outer clothing pat-down based only on reasonable suspicion, the Court emphasized that "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Id. at 21, 88 S.Ct. at 1879; see also id. at 21 n. 18, 88 S.Ct. at 1880 n. 18 ("This demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence.")
 In Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), the Court reaffirmed the principles of Terry, and held that an individual could not be stopped and interrogated, even briefly, solely on the basis of that individual's presence in a "high drug problem area." See also Ybarra v. Illinois, 444 U.S. 85, 92-96, 100 S.Ct. 338, 342-45, 62 L.Ed.2d 238 (1979) (presence at premises being searched pursuant to lawful search warrant not sufficient justification for police "frisk"). While stressing that some sort of particularized suspicion was necessary in order to effect the seizure in question, the Court observed that
 the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limits on the conduct of individual officers.
 443 U.S. at 51, 99 S.Ct. at 2640 (emphasis added). This caveat in Brown is of crucial importance to our decision in the present case, as the discussion in text illustrates.
 
 
 [7]
 The question whether the "administrative search" doctrine is applicable to urine testing programs has engendered significant debate. Compare Lovvorn v. City of Chattanooga, 846 F.2d 1539, 1545-46 (6th Cir.1988) ("We are unconvinced that the amount of regulation in a given employment context, or analogies to administrative searches, should be the basis for determining whether the individual employee's privacy interests is [sic] less weighty than the government's asserted interests."); Railway Labor Executives' Ass'n v. Burnley, 839 F.2d 575, 584-85 (9th Cir.), cert. granted, --- U.S. ----, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988) with Rushton v. Nebraska Pub. Power Dist., 844 F.2d 562, 566 (8th Cir.1988); Shoemaker v. Handel, 795 F.2d 1136, 1142 (3d Cir.), cert. denied, 479 U.S. 986, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986). To the extent that the "administrative search" doctrine involves searches of commercial premises in industries with significant histories of pervasive governmental regulation, it is of course not literally applicable to the urinalysis context. However, in the "administrative search" cases the Supreme Court has construed and applied the same constitutional provision involved in the present case; to that extent, we consider the "administrative search" jurisprudence relevant to our inquiry
 
 
 [8]
 See New York v. Burger, 482 U.S. 691, 107 S.Ct. 2636, 2642-44, 96 L.Ed.2d 601 (1987); Donovan v. Dewey, 452 U.S. 594, 599-606, 101 S.Ct. 2534, 2538-2539, 69 L.Ed.2d 262 (1981); Marshall v. Barlow's, Inc., 436 U.S. 307, 313-24, 98 S.Ct. 1816, 1820-27, 56 L.Ed.2d 305 (1978); Almeida-Sanchez v. United States, 413 U.S. 266, 271, 93 S.Ct. 2535, 2538, 37 L.Ed.2d 596 (1973) ("The businessman in a regulated industry in effect consents to the restrictions placed upon him."); See v. City of Seattle, 387 U.S. 541, 543-46, 87 S.Ct. 1737, 1739-41, 18 L.Ed.2d 943 (1967); Serpas v. Schmidt, 827 F.2d 23, 28-29 (7th Cir.1987) (invalidating administrative search program where neither governing statute nor regulations adequately limited enforcement discretion of field officer), cert. denied, --- U.S. ----, 108 S.Ct. 1075, 99 L.Ed.2d 234 (1988); Bionic Auto Parts and Sales, Inc. v. Fahner, 721 F.2d 1072, 1078 (7th Cir.1983) (in order for inspecting officer's discretion to be adequately limited, regulatory scheme "must define clearly what is to be searched, who can be searched, and the frequency of such searches")
 
 
 [9]
 Such regulations have been upheld against a variety of challenges under the federal constitution and state law. See, e.g., Davenport v. Randolph Cty. Bd. of Educ., 730 F.2d 1395 (11th Cir.1984) (upholding rule requiring interscholastic athletes to be clean shaven); Clements v. Board of Educ. of Decatur Pub. School Dist. No. 61, 133 Ill.App.3d 531, 88 Ill.Dec. 601, 478 N.E.2d 1209 (4th Dist.1985) (upholding suspension of interscholastic high school athlete for presence at party where alcoholic beverages served to minors, despite fact that suspended athlete did not herself consume alcoholic beverages); Humphries v. Lincoln Parish School Bd., 467 So.2d 870 (La.App.1985) (upholding removal of interscholastic athletes for violation of rule prohibiting facial hair during football season); Braesch v. DePasquale, 200 Neb. 726, 265 N.W.2d 842 (1978) (upholding rule prohibiting interscholastic athletes from drinking, smoking or using drugs on or off school grounds), cert. denied, 439 U.S. 1068, 99 S.Ct. 836, 59 L.Ed.2d 34 (1979)
 
 
 [10]
 Of course, the considerations discussed in the text also serve to distinguish athletes from members of the general school population. Our decision today should not be read as endorsing urine testing of all students attending a school. Cf. Odenheim v. Carlstadt-East Rutherford Regional School Dist., 211 N.J.Super. 54, 510 A.2d 709 (1985) (invalidating program requiring every student enrolled in school to submit to annual urinalysis); Note, Dragnet Drug Testing in Public Schools and the Fourth Amendment, 86 Colum.L.Rev. 852 (1986)
 
 
 [11]
 The question presented in this case is whether the TSC urinalysis program is a "reasonable search" under the fourth amendment. We concluded above that the TSC program effects a "search," despite the fact that students will be tested only if they have previously signed a consent form. However, the fact that a student may avoid the contemplated search entirely by choosing not to participate in TSC's athletic program is surely relevant to the separate inquiry whether the searches conducted are "reasonable." It cannot be disputed that a considerably greater intrusion occurs where an individual has no realistic option but to submit to a search
 
 
 [12]
 Moreover, a student may shorten this suspension by participating in professional drug counselling
 
 
 [13]
 Cf. Caruso v. Ward, 72 N.Y.2d 432, 534 N.Y.S.2d 142, 146, 530 N.E.2d 850, 853 (1988) (upholding random urinalysis of police officers volunteering for organized crime unit; noting that officers "have a very diminished expectation of privacy due to their pursuit of service in the elite unit based on conditions known in advance")
 
 
 [14]
 Student athletes at McCutcheon High School were informed in advance that they would be required to submit to urinalysis in the fall of 1986. This administration of the tests yielded no positive results. However, the lack of positive urinalysis results may be as easily explained by the deterrent effect of the urinalysis program as by the absence of any drug usage among McCutcheon's interscholastic athletes
 
 
 [15]
 This includes the use of steroids and other performance-enhancing drugs, which pose serious risks to the health of young athletes
 
 
 [16]
 Thus, in the present case, TSC's interest is not merely in detecting and deterring drug use by students while on school premises during school hours. This serves to distinguish this case from other urinalysis cases in which courts have placed significant emphasis on the fact that urinalysis does not effectively measure current impairment. See, e.g., Lovvorn v. City of Chattanooga, 846 F.2d 1539, 1548 (6th Cir.1988); Railway Labor Executives' Ass'n v. Burnley, 839 F.2d 575, 588-89 (9th Cir.), cert. granted, --- U.S. ----, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988)
 
 
 [17]
 Plaintiffs argue at some length that consumption of alcohol is the most serious substance abuse problem among high school students and that urinalysis is an ineffective procedure for detecting alcohol use. However, we do not believe that the decision of TSC school authorities to focus their attention on the problem of illegal and performance-enhancing drug use, to the exclusion of alcohol abuse, is relevant to our analysis of TSC's urine testing program. See Lovvorn v. City of Chattanooga, 846 F.2d 1539, 1545 (6th Cir.1988) (argument that urinalysis unconstitutional because alcohol abuse problems not addressed "cloud[s] the complainant's true criticisms of drug testing," since "problems of underinclusiveness are rarely problems of constitutional magnitude unless they signify impermissible discriminatory motives")
 
 
 [18]
 At oral argument and more pointedly in their petition for rehearing, plaintiffs have argued that TSC officials are required under a recent revision of Indiana controlled substances law to report positive urine test results to law enforcement officials. See Ind. Code 35-48-5-2 to -4. There are several apparent flaws in plaintiffs' argument. Foremost among them is the fact that the Indiana statute only requires reporting of "personal observation" or "personal knowledge" of drug possession or trafficking within one thousand feet of school premises; presence of drug metabolites in a student's urine would not, apparently, amount to "possession" of a controlled substance, on school premises or elsewhere. See, e.g., People v. Spann, 187 Cal. App. 3d 400, 403-09, 232 Cal. Rptr. 31, 32-36 (1986); State v. Flinchpaugh, 232 Kan. 831, 659 P.2d 208, 211-13 (1983)
 Throughout the proceedings before the district court and on appeal, TSC has consistently disclaimed any intention to employ its urinalysis program as a means of establishing criminal violations by its students, and has unequivocally stated its belief that the results of its urine tests would not be subject to disclosure under the reporting statute. We are not persuaded that the existence of the reporting law, or the mere possibility that TSC's urinalysis program might become a tool of law enforcement, is a sufficiently ripe factor to merit definitive adjudication here. If, as the program is implemented, it develops that a purpose of the urine testing program is to adduce evidence for use in criminal proceedings, plaintiffs and others are of course free to renew their fourth amendment challenge in the district court.
 
 
 [19]
 Two other contentions made be appellants deserve brief mention. Appellants suggest that the TSC program is unjustified in scope, because urine samples may be tested for a variety of conditions, such as pregnancy and use of birth control. The program's written guidelines authorize testing only for controlled substances and performance-enhancing drugs. On this facial challenge, we must assume that the TSC program will be administered in good faith and that tests will be restricted to those substances listed in the written guidelines
 Appellants also argue that TSC's urinalysis program requires students to disclose confidential information, including the use of prescription medications, in order to rebut a positive test result, in violation of the student's right of privacy. We recognize that these students have a substantial privacy interest in the confidentiality of medical information. See Whalen v. Roe, 429 U.S. 589, 598-600, 97 S.Ct. 869, 51 L.Ed.2d64 (1977); Pesce v. J. Sterling Morton High School Dist. 201, 830 F.2d 789, 795-98 (7th Cir.1987). However, such information need only be disclosed in the event of a positive urine test, and will only be conveyed to the athletic director. In the absence of any indication that confidential medical information will be more widely disseminated, we refuse to invalidate the TSC program on this ground.
 
 
 [20]
 See, e.g., Hebert v. Ventetuolo, 638 F.2d 5, 6 (1st Cir.1980) (per curiam) (no liberty interest infringed by removal from hockey team on grounds of fraudulently concealing true residence in order to enroll in school); Barbay v. NCAA, No. 86 5697 (E.D.La. Jan. 20, 1987) (1987 WL 5619) (liberty interest not infringed where athlete removed from college team for steroid use, where athlete did not demonstrate "that he was defamed or that his reputation was damaged"); Kriss v. Brown, 180 Ind.App. 594, 605, 390 N.E.2d 193, 200 (1979) (no infringement of liberty interest where athlete produced "no evidence that anything adverse to his good name has been made a part of his permanent school record or that he has suffered disgrace of any sort")
 
 
 [21]
 Of course, an actual false positive which is not corrected on review by the athletic director may serve as the basis of a future due process challenge. However, on the current record we believe that TSC has adopted sufficient procedures and test protocols to correct false positive test results, if they do indeed occur