# IN THE SUPREME COURT OF IOWA

No. 14–0773

Filed June 24, 2016

**STATE OF IOWA,**

    Appellee,

vs.

**MAR'YO D. LINDSEY JR.,**

    Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Black Hawk County, Kellyann M. Lekar (motion to suppress), David F. Staudt (trial and sentencing), Judges.

A high school student seeks further review of a court of appeals decision affirming the denial of his motion to suppress evidence obtained from a search by a public school official. **DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

Mark C. Smith, State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Tyler J. Buller, Assistant Attorney General, Thomas J. Ferguson, County Attorney, and Peter Blink, Assistant County Attorney, for appellee.

**APPEL, Justice.**

In this case, we consider whether a search of a high school student's football equipment bag by a school official violated the constitutional limitations on searches and seizures under the Fourth Amendment of the United States Constitution and article I, section 8 of the Iowa Constitution. The district court found that the school official had reasonable grounds to search the bag. The court of appeals affirmed. We granted further review. For the reasons expressed below, we affirm.

## I. Background Facts and Procedure.

On August 30, 2013, Mar'yo Lindsey Jr. was playing football for Dunkerton High School, Dunkerton, Iowa. The game was held in Riceville, Iowa. Lindsey brought his school-issued equipment bag with him to Riceville. Football players use their equipment bags to transport their gear to sporting events. Lindsey placed the equipment bag, which had his name marked on it, in the team's locker room upon arrival at Riceville.

Unfortunately, Lindsey was badly injured during the game. The Dunkerton school superintendent, James Stanton, called an ambulance to take Lindsey to the hospital. While paramedics were getting Lindsey ready for transport, Lindsey told Stanton to give his bag to a friend and to not let anybody else other than his friend have the bag or "mess with it." Lindsey repeated this admonition several times.

Stanton asked head football coach Jonathan Steffen to take the bag back to Dunkerton. Steffen placed the bag on a table in the commons area of the Dunkerton lunchroom for the superintendent. Stanton then moved the bag, placing it on the floor, and heard a metallic sound. Stanton believed the sound was that of a firearm hitting the

surface of the floor. At this point, he unzipped the bag, found a blue backpack inside it, opened that bag, and discovered a long-barreled handgun along with a bag which appeared to contain marijuana, rolling papers, and other drug paraphernalia. The superintendent secured the bag and called law enforcement.

Lindsey was subsequently charged with possession of a firearm as a felon, carrying a weapon on school grounds, carrying a weapon, and possession of a controlled substance. Lindsey pled not guilty. Lindsey filed a motion to suppress the evidence found in the equipment bag. He claimed the search of his equipment bag violated his right to be free from unreasonable searches and seizures under the Iowa and United States Constitutions.

A hearing was held on the motion to suppress. At the hearing, Stanton testified about the evening of August 30. He stated that at the time of the injury, a number of people assembled on the field—the athletic directors from both Riceville and Dunkerton, the ambulance personnel from Riceville, and one of the game officials. Lindsey was put in a cervical collar and placed on a backboard to prevent further injury. At that time, Lindsey said, "[P]lease make sure that Keota gets my bag. Don't let anybody but Keota have my bag." Keota was a fellow student on the football team. Stanton further testified that the school had a policy in place and posted on the two main entry doors of the school building that all bags are subject to search. Stanton testified that he became suspicious when Lindsey stated that he did not want anyone else to take his bag.

Stanton instructed Steffen to make sure that Stanton got the bag when they got back to Dunkerton. According to Stanton, when he arrived at Dunkerton, the bag was sitting on the table in the commons.

Stanton testified that he picked up the bag and set it on the floor. When he did so, there was a "very discernable loud clunk." Stanton testified that he had a lot of experience with firearms as a hunter and collector, and he owned one pistol. When the bag hit the ground and made the sound, Stanton testified he was "one hundred percent sure" when the bag hit the floor "[t]hat it was a gun." Stanton testified he was aware that prior to that date Lindsey had been suspended from school for possession of drug paraphernalia and that he had some weapons charges from activities not related to school.

After Stanton heard the loud clunk, he opened the equipment bag. Inside the bag was a backpack. Inside that bag was some drug paraphernalia and the gun. Stanton inspected the gun. The gun was loaded.

Coach Steffen also testified at the suppression hearing. Steffen testified that when football players go to away games, each player has a big red equipment bag that is used to hold their shoulder pads, helmets, cleats, and other equipment. Steffen stated that when he attended to Lindsey on the field, "it seemed that it was going to be a pretty serious injury" and that Lindsey's statement that he wanted "a certain kid" to get the bag and that "nobody would mess with it . . . kind of raised a red flag."

Steffen testified that after Lindsey was placed in the ambulance, Stanton told him to get the bag and not let one of the kids grab it before they left. As a result, Steffen stated he grabbed the bag after the game, took it onto the school bus, and placed it on a seat next to his wife. On the bus ride home, the coach received a telephone call from Lindsey, who again inquired about his bag and directed that the bag be given only to a specific friend. Upon arrival at Dunkerton, Steffen placed the bag in the

commons area in the lunch room. When Stanton arrived, he told Steffen he planned to search the bag. Steffen later saw the results of the search. Steffen stated he was aware that Lindsey was involved with possession of firearms and that he had been "in juvenile detention or something" for a while as a result.

The district court denied the motion to suppress. After canvassing the facts, the district court noted that the parties agreed that *State v. Benjegerdes* was the applicable Iowa appellate court decision to the issue presented in this case.[1]  No. 09–1230, 2011 WL 3925411 (Iowa Ct. App. Sept. 8, 2011). The district court noted that the analysis in *Benjegerdes* relied primarily on the United States Supreme Court case of *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S. Ct. 733, 83 L. Ed. 2d 720 (1985). *Benjegerdes*, 2011 WL 3925411, at *3.

The district court concluded that under *T.L.O.* the court should consider whether the search was justified at its inception and then whether the scope of the search was reasonable. According to the court, both prongs were met. The court reasoned that the search was reasonable from the inception because of Lindsey's unusual insistence that his bag be given to no one other than a specific friend as he lay injured on the field and in the phone call to the coach afterwards. Further, the court cited the distinctive metal sound Stanton heard when the bag hit the ground as supporting the search. The district court concluded there was particularized suspicion under the totality of circumstances.

---

[1]Under Iowa Rule of Appellate Procedure 6.904(2)(*c*), unpublished decisions of the court of appeals do not constitute binding authority on appeal. The parties' agreement that the applicable Iowa appellate decision was *Benjegerdes*, however, helps define the issues actually before the district court and properly before us on appeal.

The court next turned to examine the scope of the search. The court reasoned that the scope of the search was justified given the reasons that gave rise to the search in the first place. In particular, the examination of the backpack inside the equipment bag was reasonable as the likely place to find the suspected firearm. While the court recognized Lindsey had a limited expectation of privacy in his equipment bag, such an interest was outweighed by the need to prevent the introduction of weapons into the school.

Lindsey appealed. We transferred the case to the court of appeals, which affirmed. We granted further review. We now affirm.

## II. Standard of Review.

We review alleged violations of the right to be free from unreasonable searches and seizures de novo. *State v. Tague*, 676 N.W.2d 197, 201 (Iowa 2004). In conducting our de novo review, we independently evaluate the totality of the circumstances as shown by the entire record. *State v. Kurth*, 813 N.W.2d 270, 272 (Iowa 2012).

## III. Discussion.

**A. Introduction.** The primary issue in this case is whether reasonable suspicion existed at the inception of the search. Although Lindsey concedes that the district court discussed the appropriate legal concepts, he maintains the court misapplied them. According to Lindsey, the inception of the search occurred in Riceville when the superintendent "requested that the head coach collect the defendant's bag for search at a later time." Lindsey asserts that the school officials did not have reasonable suspicion to seize his bag at Riceville. According to Lindsey, all he did was ask that a specific student be given his bag and that no one mess with it. That, according to Lindsey, is simply insufficient to rise to the level of reasonable suspicion.

According to Lindsey, the district court erred in its reasonable-suspicion analysis when it considered the clang of metal that occurred after the equipment bag was seized and transported to Lindsey's home school. What happened after the seizure—specifically the metallic clang heard by Stanton—is irrelevant to the question of whether the seizure of the equipment bag in Riceville was lawful in the first place. Lindsey claims that supporting the search based on him asserting "a number of times that he did not want anyone to 'mess' with his stuff" is tantamount to permitting searches whenever anyone refuses to consent to a search.

The State presents a layered counter-argument. First, the State argues that the transportation of the bag from Riceville to Dunkerton was not a seizure. According to the State, the equipment bag was moved as part of routine student activity and that the doctrine of *in loco parentis* authorized the school to move a student's belongings back from an away football game. Second, the State argues the transport of the equipment bag did not violate Lindsey's reasonable expectation of privacy or materially interfere with a possessory interest.

**B. Applicable United States Supreme Court Framework.** Iowa is no stranger to questions regarding constitutional rights in public school settings. In *State v. Bartels*, we upheld the conviction of a teacher who taught German in school in violation of a statute prohibiting the teaching of any language except English to students below eighth grade. 191 Iowa 1060, 1074, 181 N.W. 508, 515 (1921). The Supreme Court, relying upon *Meyer v. Nebraska*, 262 U.S. 390, 43 S. Ct. 625, 67 L. Ed. 1042 (1923), reversed. *Bartels v. Iowa*, 262 U.S. 404, 409, 411, 43 S. Ct. 628, 629–30, 67 L. Ed. 1047, 1050–51 (1923). In *Meyer*, the Supreme Court struck down a similar Nebraska statute as violating the liberty interests of teachers and parents under the Due Process Clause of the

Fourteenth Amendment. *Meyer,* 262 U.S. at 403, 43 S. Ct. at 628, 67 L. Ed. at 1047; *see also Bartels*, 262 U.S. at 409, 43 S. Ct. at 629, 67 L. Ed. at 1050 (addressing statutes from Iowa, Nebraska, and Ohio).

Almost fifty years later, the Supreme Court considered another case involving the constitutional rights of students from Iowa. In *Tinker v. Des Moines Independent Community School District,* the United States Supreme Court reversed a district court opinion dismissing a complaint brought by students challenging a school's prohibition of wearing black armbands on its property to protest the Vietnam War. 393 U.S. 503, 514, 89 S. Ct. 733, 740, 21 L. Ed. 2d 731, 742 (1969). In memorable language, the Supreme Court declared that "[i]t can hardly be argued that either students or teachers shed their constitutional rights . . . at the schoolhouse gate." *Id.* at 506, 89 S. Ct. at 736, 21 L. Ed. 2d at 737. While *Tinker* is a seminal case, it dealt solely with the First Amendment rights of students. *Id.* at 505–06, 89 S. Ct. at 736, 21 L. Ed. 2d at 737.

The question of whether students were protected from unlawful searches and seizures under the Fourth Amendment remained an open one for many years. The United States Supreme Court addressed this important issue in *T.L.O.,* 469 U.S. at 333, 105 S. Ct. at 738, 83 L. Ed. 2d at 729. In *T.L.O.,* a teacher discovered a student and a classmate smoking cigarettes in a school lavatory in violation of a school rule. *Id.* at 328, 105 S. Ct. at 735, 83 L. Ed. 2d at 726. They were taken to the principal's office, where an assistant vice principal demanded to see the student's purse. *Id.* at 328, 105 S. Ct. at 735–36, 83 L. Ed. 2d at 726. Upon opening the purse, the assistant vice principal found a package of cigarettes and rolling papers associated with smoking marijuana. *Id.* at 328, 105 S. Ct. at 736, 83 L. Ed. 2d at 726. The assistant vice principal searched the purse more thoroughly and found

some marijuana, a pipe, plastic bags, a substantial amount of money, an index card with a list of students who owed the student money, and two letters implicating her in marijuana dealing. *Id.* As a result of the discovered contraband and a subsequent confession, the state brought delinquency charges against T.L.O. in juvenile court. *Id.* at 329, 105 S. Ct. at 736, 83 L. Ed. 2d at 726. T.L.O. sought to suppress the evidence found in her purse as well as the later confession as fruits of an unlawful search. *Id.* The New Jersey Supreme Court suppressed the search, and the state appealed to the United States Supreme Court. *Id.* at 330–31, 105 S. Ct. at 736–37, 83 L. Ed. 2d at 727–28.

The Supreme Court first determined that the strictures of the Fourth Amendment apply to activities of civil authorities, including school officials. *Id.* at 336–37, 105 S. Ct. at 740, 83 L. Ed. 2d at 731. It rejected the notion that public schools merely exercise delegated parental authority conferred upon them by individual parents, but instead emphasized that school officials "act in furtherance of publicly mandated educational and disciplinary policies." *Id.* at 336, 105 S. Ct. at 740, 83 L. Ed. 2d at 731.

The Supreme Court next turned to consider what searches by school officials might be reasonable under the Fourth Amendment. *Id.* at 337, 105 S. Ct. at 740, 83 L. Ed. 2d at 731. The Supreme Court declared that a determination of reasonableness requires "balancing the need to search against the invasion which the search entails." *Id.* (quoting *Camara v. Mun. Ct.*, 387 U.S. 523, 537, 87 S. Ct. 1727, 1735, 18 L. Ed. 2d 930, 940 (1967)).

With respect to the student's interest in privacy, the *T.L.O.* Court noted that "searches of closed items of personal luggage are intrusions on protected privacy interests." *Id.* at 337, 105 S. Ct. at 740, 83

L. Ed. 2d at 732. The Supreme Court stated, however, that "an expectation of privacy must be one that society is 'prepared to recognize as legitimate.'" *Id.* at 338, 105 S. Ct. at 741, 83 L. Ed. 2d at 732 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526, 104 S. Ct. 3194, 3200, 82 L. Ed. 2d 393, 402 (1984)). The Court recognized that students in schools have legitimate interests in privacy. *Id.* at 339, 105 S. Ct. at 741, 83 L. Ed. 2d at 733. The Court observed students might lawfully bring to school "highly personal items [such] as photographs, letters, and diaries," but also may carry with them "articles of property needed in connection with extracurricular or recreational activities." *Id.*

Balanced against the student's interest in privacy, however, the Supreme Court recognized "the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds." *Id.* The Court emphasized that "maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures," including "preserving the informality of the student–teacher relationship." *Id.* at 339–40, 105 S. Ct. at 742, 83 L. Ed. 2d at 733.

Having recognized the student's interest in privacy and the school's interest in maintaining discipline, the Supreme Court proceeded to balance the interests. *Id.* at 340, 105 S. Ct. at 742, 83 L. Ed. 2d at 733. The Court declared that searches in the school setting require some modification of the level of suspicion required. *Id.* While the Court noted that "probable cause and the requirement of a warrant bear on the reasonableness of a search . . . in certain limited circumstances neither is required." *Id.* at 340–41, 105 S. Ct. at 742, 83 L. Ed. 2d at 733–34 (quoting *Almeida-Sanchez v. United States*, 493 U.S. 266, 277, 93 S. Ct. 2535, 2541, 37 L. Ed. 2d 596, 605 (1973) (Powell, J., concurring)). The

Supreme Court determined that in the school setting probable cause is not required for a search, but instead, a school search requires "reasonableness, under all the circumstances." *Id.* at 341, 105 S. Ct. at 742, 83 L. Ed. 2d at 734. In order for a search to meet this requirement, the search must be (1) justified at the time of its inception and (2) reasonable in terms of the scope of the search. *Id.* at 341, 105 S. Ct. at 742–43, 83 L. Ed. 2d at 734.

Having established this framework to analyze school searches, the Supreme Court recognized that the reasonable grounds standard applied by the New Jersey Supreme Court in suppressing the evidence in the case was "not substantially different." *Id.* at 343, 105 S. Ct. at 743–44, 83 L. Ed. 2d at 736. Nonetheless, the Supreme Court held that the state court's application of the standard "reflect[ed] a somewhat crabbed notion of reasonableness." *Id.* at 343, 105 S. Ct. at 744, 83 L. Ed. 2d at 736.

Looking at the facts of the case, the Court found two searches—one that yielded the cigarettes and a second that produced the marijuana and other evidence of involvement with drugs. *Id.* at 343–44, 105 S. Ct. at 744, 83 L. Ed. 2d at 736. With respect to the first search, the Court noted that T.L.O. was accused of smoking, which she denied. *Id.* at 345, 105 S. Ct. at 744, 83 L. Ed. 2d at 737. Her purse was an obvious place to look for cigarettes. *Id.* at 345–46, 105 S. Ct. at 745, 83 L. Ed. 2d at 737. The Court noted that the assistant vice principal's conclusion that cigarettes might be in her purse was not an "inchoate and unparticularized suspicion or 'hunch'" but was "the sort of 'common-sense conclusio[n] about human behavior' upon which 'practical people'—including government officials—are entitled to rely." *Id.* at 346, 105 S. Ct. at 745, 83 L. Ed. 2d at 737 (first quoting *Terry v. Ohio*, 392

U.S. 1, 27, 88 S. Ct. 1868, 1883, 20 L. Ed. 2d 889, 909 (1968); and then quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S. Ct. 690, 695, 66 L. Ed. 2d 621, 629 (1981)).

The search for cigarettes yielded not only cigarettes but also rolling papers associated with marijuana use which gave rise to the reasonable belief that T.L.O. was carrying marijuana as well as cigarettes in her purse. *Id.* at 347, 105 S. Ct. at 745–46, 83 L. Ed. 2d at 738. This suspicion justified further examination of her purse. *Id.* at 347, 105 S. Ct. at 746, 83 L. Ed. 2d at 738.

Justices Brennan, Marshall, and Stevens dissented in part. Justice Brennan, joined by Justice Marshall, asserted that the only content to the reasonableness standard of the majority was that it was different from the probable cause standard established by the Fourth Amendment. *Id.* at 354, 105 S. Ct. at 749, 83 L. Ed. 2d at 743 (Brennan, J., concurring part and dissenting in part). Justice Brennan conceded that school authorities could conduct the search of student belongings without a warrant. *Id.* at 355–56, 105 S. Ct. at 750, 83 L. Ed. 2d at 744. He strongly objected, however, to casting aside the probable cause requirement. *Id.* at 357, 105 S. Ct. at 751, 83 L. Ed. 2d at 745.

Justice Stevens, joined by Justice Marshall and in part by Justice Brennan, filed a dissent in part that took issue with the sweep of the majority opinion. *Id.* at 371, 105 S. Ct. at 758, 83 L. Ed. 2d at 754 (Stevens, J., concurring in part and dissenting in part). Justices Stevens and Marshall thought the standard enunciated by the majority would allow, for example, searches for curlers or sunglasses to enforce a dress code. *Id.* at 377, 105 S. Ct. at 762, 83 L. Ed. 2d at 758. Further, the New Jersey Supreme Court appeared to have applied the very same standard of the majority, and Justice Stevens argued that the state

court's application was the correct approach. *Id.* at 382–85, 105 S. Ct. at 764–66, 83 L. Ed. 2d at 761–63.

Since *T.L.O.*, the Supreme Court has decided only a few search and seizure cases involving students and school authorities. In *Vernonia School District 47J v. Acton*, the Supreme Court upheld a high school policy authorizing random drug testing of all student athletes. 515 U.S. 646, 648, 664–65, 115 S. Ct. 2386, 2388, 2396, 132 L. Ed. 2d 564, 571, 582 (1995). The Court concluded that student athletes have a lesser expectation of privacy with respect to medical examinations and compliance with rules of conduct established for a given sport. *Id.* at 657, 115 S. Ct. at 2392–93, 132 L. Ed. 2d at 577. The Court found that legitimate privacy expectations are less for student athletes who routinely lack privacy in locker rooms and there is "an element of 'communal undress' inherent in athletic participation." *Id.* at 657, 115 S. Ct. at 2392–93, 132 L. Ed. 2d at 577 (quoting *Schaill v. Tippecanoe Cty. Sch. Corp.*, 864 F.2d 1309, 1318 (7th Cir. 1988)).

The decision in *Vernonia* emphasized a combination of factors, including the lesser expectation of privacy of student athletes and the unobtrusiveness of the particular method of drug testing at issue. *Id.* at 657–58, 115 S. Ct. at 2392–93, 132 L. Ed. 2d at 577–78. Finally, the Court noted that the trial court found that at the high school in question, " 'a large segment of the student body . . . was in a state of rebellion,' that '[d]isciplinary actions had reached "epidemic proportions," ' and that 'the rebellion was being fueled by alcohol and drug abuse as well as by the student's misperceptions about the drug culture.' " *Id.* at 662–63, 115 S. Ct. at 2395, 132 L. Ed. 2d at 580 (quoting *Acton v. Vernonia Sch. Dist. 47J*, 796 F. Supp. 1354, 1357 (D. Or. 1992)).

Justice O'Connor, joined by Justices Stevens and Souter, dissented. *Id.* at 666, 115 S. Ct. at 2397, 132 L. Ed. 2d at 583 (O'Connor, J., dissenting). They objected to the policy as a general search and therefore contrary to precedent and the philosophy of the Framers. *Id.* at 667, 669–70, 115 S. Ct. at 2397–99, 132 L. Ed. 2d at 583–85. Justice O'Connor also criticized the choice of the school to focus its suspicionless drug testing on athletes. *Id.* at 685, 115 S. Ct. at 2406, 132 L. Ed. 2d at 595. She found it unreasonable to target student athletes, who were selected apparently for purposes of legal strategy, without factual support in the record for that distinction. *Id.*

A mandatory drug test of all students participating in extracurricular activities was upheld in *Board of Education of Independent School District No. 92 v. Earls*, 536 U.S. 822, 838, 122 S. Ct. 2559, 2569, 153 L. Ed. 2d 735, 749–50 (2002). The *Earls* Court stated that although students participating in extracurricular activities were not all subject to the same privacy intrusions as athletes, extracurricular activities were nonetheless subject to substantial regulation. *Id.* at 831–32, 122 S. Ct. at 2565–66, 153 L. Ed. 2d at 745–46. Because of the substantial regulation, students affected by the extracurricular drug testing policy had a diminished expectation of privacy. *Id.* at 832, 122 S. Ct. at 2566, 153 L. Ed. 2d at 745–46. As in *Vernonia*, the Court emphasized the limited nature of the intrusion and the findings of fact of the trial court that the school in question had a drug problem. *Id.* at 834–35, 122 S. Ct. at 2567, 153 L. Ed. 2d at 747.

Justice Ginsburg, along with Justices Stevens, O'Connor, and Souter, dissented. *Id.* at 842, 122 S. Ct. at 2571, 153 L. Ed. 2d at 752 (Ginsburg, J., dissenting). Justice Ginsburg noted that although students participating in competitive extracurricular activities were

targeted, the underlying rationale applied to all school children. *Id.* at 844, 122 S. Ct. at 2572, 153 L. Ed. 2d at 753–54. She further found extracurricular activities, though voluntary, were in fact part of the schools educational program. *Id.* at 845, 122 S. Ct. at 2573, 153 L. Ed. 2d at 754. Justice Ginsburg then distinguished the random provision of urine samples in *Vernonia*, noting that athletes have a reduced expectation of privacy and a special susceptibility to injury caused by use of illegal drugs, none of which were involved in *Earls*. *Id.* at 853–54, 122 S. Ct. at 2577, 153 L. Ed. 2d at 759.

Finally, in *Safford Unified School District No. 1 v. Redding*, the Supreme Court considered the validity of a search of the person and property of a thirteen-year-old female student suspected of possessing contraband including prescription-strength drugs. 557 U.S. 364, 368–69, 129 S. Ct. 2633, 2637–38, 174 L. Ed. 2d 354, 360 (2009). School officials discovered a day planner belonging to Redding that contained knives and a cigarette. *Id.* at 368, 129 S. Ct. at 2368, 174 L. Ed. 2d at 360. Redding admitted the day planner was hers, but said she had loaned the day planner to a friend and that none of the items inside it were hers. *Id.* The assistant principal then confronted her with several over-the-counter pain relievers and stated he had received a report that Redding was supplying pills to students in violation of school policy. *Id.* Redding denied the allegations and agreed to allow school officials to search her backpack. *Id.* No contraband was found. *Id.* The assistant principal then had a female school official search Redding's clothing and perform a strip search. *Id.* at 369, 129 S. Ct. at 2638, 174 L. Ed. 2d at 360. No pills were found. *Id.*

The Supreme Court applied the reasonableness standard of *T.L.O.* to determine the validity of the search. *Id.* at 375, 129 S. Ct. at 2642,

174 L. Ed. 2d at 364. The Court indicated that reliable information to support a search in the context of school authorities was information that raises "a moderate chance of finding evidence of wrongdoing," a lesser standard than the "fair probability" required for a *Terry*[2]-type search by law enforcement. *Id.* at 371, 129 S. Ct. at 2639, 174 L. Ed. 2d at 362 (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332, 76 L. Ed. 2d 527, 548 (1983)).

The Court found there was sufficient reliable information to justify the search of Redding's backpack and outer clothing, but not for the strip search which exposed Redding's breasts and pelvic area. *Id.* at 373–77, 129 S. Ct. at 2641–43, 174 L. Ed. 2d at 363–65. The Supreme Court recognized that "distinct elements of justification on the part of school authorities for going beyond a search of outer clothing and belongings" were required due to the high level of both "subjective and reasonable societal expectations of personal privacy" implicated by a strip search. *Id.* at 374, 129 S. Ct. at 2641, 174 L. Ed. 2d at 364.

**C. Court Cases Applying the Federal Framework.**

1. *Expectation of privacy when participating in athletics.* *T.L.O.* generally established that the Fourth Amendment of the United States Constitution provides school students with a limited expectation of privacy in the school setting and that searches based upon individualized suspicion must be reasonable. 469 U.S. at 341, 105 S. Ct. at 742, 83 L. Ed. 2d at 734. *Vernonia* then clarified that in the context of random drug searches "[l]egitimate privacy expectations [of students] are even less with regard to student athletes." 515 U.S. at 657, 115 S. Ct. at

---

[2]*Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968) (holding stop and frisk searches reasonable).

2392, 132 L. Ed. 2d at 577[3] (majority opinion); *see Joye v. Hunterdon Cent. Reg'l High Sch. Bd. of Educ.*, 826 A.2d 624, 642 (N.J. 2003). Yet, *Vernonia* did not involve a search based on individualized suspicion, but instead a random search which was minimally intrusive in light of the communal nature of group athletic activity. 515 U.S. at 657, 115 S. Ct. at 2392–93, 132 L. Ed. 2d at 577. Thus, under the Supreme Court's approach to the Fourth Amendment student athletes still retain some expectation of privacy, but in at least some contexts—such as random drug testing—that expectation may be diminished under all the facts and circumstances. *See Gruenke v. Seip*, 225 F.3d 290, 301 (3d Cir. 2000) (holding student athletes have very limited expectation of privacy).

2. *History of prior infractions.* In this case, it was undisputed that school authorities had knowledge that the student had a prior history of drug infractions and a weapons charge. To what extent is a prior history of discipline relevant in determining the reasonableness of a search of a student bag for drugs or contraband?

There is some authority for the proposition that a history of prior infractions is not, in and of itself, sufficient to support a search of a student without other factors. *See M.M. v. Anker*, 477 F. Supp. 837, 841–42 (E.D.N.Y.), *aff'd*, 607 F.2d 588, 589 (2d Cir. 1979). In *Anker*, the court indicated that mere past involvement in theft was not sufficient

---

[3]Two state supreme courts have declined to follow *Vernonia* under state constitutional search and seizure provisions. *See Theodore v. Del. Valley Sch. Dist.*, 836 A.2d 76, 90, 96 (Pa. 2003) (invalidating school district drug and alcohol testing policy for extracurricular activities under article I, section 8 of the Pennsylvania Constitution); *York v. Wahkiakum Sch. Dist. No. 200*, 178 P.3d 995, 1006 (Wash. 2008) (en banc) (invalidating suspicionless drug testing under article I, section 7 of the Washington Constitution).

cause, in and of itself, for a strip search of the student to recover missing property. *Id.* at 842.

Additionally, when prior infractions are used to justify a search there must be a linkage between the past violations and the wrongdoing sought to be discovered. For instance, in *Commonwealth v. Damien D.*, the student's history of truancy did not provide reasonable suspicion for a search for contraband because there was no relationship between absence from the classroom and drug infractions. 752 N.E.2d 679, 683 (Mass. 2001).

In most cases, however, the history of prior disciplinary problems is combined with other factors to provide a reasonable basis for the search. For example, in *Cornfield v. Consolidated High School District No. 230*, the United States Court of Appeals for the Seventh Circuit upheld a search of a student with a past history of illicit activities when, among other things, a bus driver had smelled marijuana from the direction where the student was seated on the bus, the student had told a teacher he was constantly thinking about drugs, the student had reportedly said he was dealing drugs and would test positive for marijuana, and he had a bulge in his pants when he had previously declared that he had "crotched" drugs during a police raid of his mother's house. 991 F.2d 1316, 1322–23 (7th Cir. 1993).

Similarly, in *State ex. rel. Galford v. Mark Anthony B.*, the court found reasonable suspicion sufficient to initially justify a search when a student with a prior history of burglary was found to have had access as a janitor's assistant to an empty classroom where $100 had been stolen from a teacher's purse. 433 S.E.2d 41, 42, 45 (W. Va. 1993). The scope of the search, however—which included pulling down the student's

underwear in a bathroom for inspection—was unreasonable in light of the relatively modest danger arising from a mere theft. *Id.* at 48–49.

Another illustrative case is *Coffman v. State*, 782 S.W.2d 249 (Tex. Ct. App. 1989). In that case, the court upheld the search of a student— who had a history of three or four disciplinary events—who was in the hallway when he should have been in class and told the school officials that he was returning from a parking lot where there had been recent thefts. *Id.* at 250. When the student was confronted, he placed a book bag behind himself, and when the school officials obtained possession of the bag, he lunged after it. *Id.* at 250–51. Further, in *State ex rel. Juvenile Department of Washington County v. DuBois*, the court considered the search of a student known to have brought weapons to the school on other occasions. 821 P.2d 1124, 1125 (Or. Ct. App. 1991). Two other students reported that they had seen the student with a gun the day before and had heard the student was bringing the gun to school on the day in question. *Id.* Recognizing that probable cause might be required under article I, section 9 of the Oregon Constitution, the court found it unnecessary to reach the question because under the circumstances even the higher standard was met. *Id.* at 1127.

3. *Furtive movements or other suspicious indicia.* In this case, the school authorities believed the student's comments gave rise to a reasonable suspicion that his equipment bag might contain something he did not want school officials to find. The question arises whether such behavior qualifies as furtive acts supporting reasonable suspicion, or whether the comments were mere assertions of the right to privacy.

An illustrative case is *T.S. v. State,* 100 So. 3d 1289 (Fla. Dist. Ct. App. 2012). In that case, a student carried her book bag in the halls during the school day, contrary to school rules. *Id.* at 1290. She was

allowed to leave the bag in the school counselor's office, which she did. *Id.* Several times during the day the student sought and was denied access to the bag. *Id.* The school counselor wondered why she wanted access to the bag and decided to conduct a search. *Id.*

The Florida court held the search was invalid. *Id.* at 1292. It noted the student involved had no history of illegal activity, the search was based on a mere hunch, and there were many innocent explanations for the student's behavior. *Id.* Several other Florida cases have reached similar conclusions under varied fact patterns. *See R.S.M. v. State*, 911 So. 2d 283, 284–85 (Fla. Dist. Ct. App. 2005) (noting lack of reasonable suspicion when student reached "towards his pockets and then jerk[ed] his hands back"); *S.V.J. v. State*, 891 So. 2d 1221, 1222–24 (Fla. Dist. Ct. App. 2005) (holding when a student looked startled and put her purse under her arm, and there was no prior complaint about drug use or other infractions involving student, the state did not have articulable facts sufficient to support search); *A.H. v. State*, 846 So. 2d 1215, 1216 (Fla. Dist. Ct. App. 2003) (holding an untrained teacher's belief that something was not right with the student was insufficient to justify a search).

In *In re William G.*, the California Supreme Court considered whether there was sufficient particularized suspicion to search a student who appeared to attempt to hide a calculator case when approached by school authorities. 709 P.2d 1287, 1289 (Cal. 1985) (en banc). The California court declared that the student's

> "furtive gestures" in attempting to hide his calculator case from [a school official's] view cannot, standing alone, furnish sufficient cause to search. Similarly, [the student]'s demand for a warrant did not create a reasonable suspicion upon which to base the search.

*Id.* at 1297 (citations omitted). Further, the court noted,

> Such conduct merely constitutes [the student]'s legitimate assertion of his constitutional right to privacy and to be free from unreasonable searches and seizures. . . . If a student's limited right of privacy is to have any meaning, *his attempt to exercise that right—by shielding a private possession from a school official's view*—cannot itself trigger a "reasonable suspicion."

*Id.* at 1297–98 (emphasis added).

An effort to disown property, however, might give rise to reasonable suspicion. In *In re Murray*, school authorities received a tip that a student might have something in his book bag that should not be there. 525 S.E.2d 496, 497 (N.C. Ct. App. 2000). When asked about his book bag, the student falsely stated the bag was not his. *Id.* at 498. According to the court, the false denial when coupled with the tip was sufficient to support a search of the book bag. *Id.* at 499. The court stated the search was based upon "the sort of 'common-sense conclusio[n] about human behavior' upon which 'practical people'— including government officials—are entitled to rely." *Id.* (quoting *T.L.O.*, 469 U.S. at 346, 105 S. Ct. at 745, 83 L. Ed. 2d at 737 (majority opinion)).

There are some cases, however, where furtive gestures, if sufficiently suggestive, may provide reasonable suspicion for a search of a student. In the pre-*T.L.O.* case of *State v. Young*, a student appeared to jump up and put something down and then "ran his hand in his pants." 216 S.E.2d 586, 588 (Ga. 1975). The court found this curious behavior and an "obvious consciousness of guilt" sufficient to support a search. *Id.* at 593. A dissent noted, however, that the furtive gestures would be insufficient to support a search based on probable cause. *Id.* at 601 (Gunter, J., dissenting).

**D. Iowa Caselaw.** The parties have not directed our attention to Iowa caselaw applying the individualized reasonable suspicion approach of *T.L.O.* in a school setting. We have, however, considered the validity of a random locker search in *State v. Jones*, 666 N.W.2d 142, 143 (Iowa 2003). In *Jones*, the school had an annual winter break locker cleanout designed to prevent accumulation of trash and school supplies and to prevent violations of laws related to weapons and drugs. *Id.* at 144. Students were provided with notice that lockers would be checked with the student present. *Id.* Jones, however, did not follow the protocol and failed to show up for the cleanout. *Id.* School officials opened and searched Jones's locker and found marijuana in the outside pocket of a coat in the locker. *Id.* We held that while Jones had a legitimate expectation of privacy in his school locker, the search was not invalid under the circumstances presented. *Id.* at 148, 150.

In sustaining the search in *Jones*, we determined that the approach in *Earls* presented the proper framework for analysis and not the individualized approach of *T.L.O. Id.* at 146. Under *Earls*, a court considers (1) "the nature of the privacy interest" at stake, (2) "the character of the intrusion," and (3) "the nature and immediacy of the [school]'s concerns and the efficacy of the [search p]olicy in meeting them." *Earls*, 536 U.S. at 830, 832, 834, 122 S. Ct. at 2565–67, 153 L. Ed. 2d at 744, 746–47 (majority opinion); *Jones*, 666 N.W.2d at 146. After analyzing these factors, we upheld the random search conducted pursuant to the established school district policy. *Jones*, 666 N.W.2d at 150.

**E. Discussion.**

1. *Introduction.* We begin by analyzing the case under the *T.L.O.* framework, which the parties agreed in the district court provides the

proper framework for analysis. In evaluating this search under the applicable framework provided by *T.L.O.*, we must engage in a two-step process. The first question is whether at the inception of the search "there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *T.L.O.*, 469 U.S. at 341–42, 105 S. Ct. at 743, 83 L. Ed. 2d at 734–35. The second question is whether the scope of the search was "reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342, 105 S. Ct. at 743, 83 L. Ed. 2d at 735.

2. *Reasonableness of the search or seizure at its inception.* In this case, there is a substantial issue regarding when the search or seizure of the equipment bag occurred. The State suggests that the mere loading of the bag onto the bus and transporting it back to the home high school was not a seizure because this is exactly what would have happened to the bag after Lindsey's injury if school authorities had no suspicion of illicit activity.

The State also suggests that because Lindsey was engaged in an athletic event, he had a reduced—perhaps even nonexistent—legitimate expectation of privacy in his school-issued equipment bag. It raises, among other things, the doctrine of *in loco parentis*, which, according to the State, suggests that a student athlete at an away game has no expectation of privacy in a bag used to carry athletic equipment.[4]

---

[4]The Supreme Court in *T.L.O.* rejected the *in loco parentis* doctrine—which literally means "in place of a parent"—the theory that the Fourth Amendment does not apply to a school official's search of a student through parental delegation, just as it does not apply to a parent's search of their child. *T.L.O.*, 469 U.S. at 336, 105 S. Ct. at 740, 83 L. Ed. 2d at 731; *see generally* 5 Wayne R. LaFave, *Search & Seizure,*

Yet, we conclude there is no need to address the issue of precisely when the search or seizure began or whether Lindsey had a reduced expectation of privacy in connection with a search of an equipment bag based on individualized suspicion because he was participating in an athletic event.[5] We conclude that even if the seizure occurred when Lindsey's equipment bag was placed on the bus by school officials, and even assuming Lindsey had a legitimate expectation of privacy in his equipment bag under *T.L.O.* standards, school officials had a reasonable basis for the seizure and subsequent search under the Fourth Amendment as construed by the United States Supreme Court.

In considering the proper result in this case, we recognize that application of the *T.L.O.* amorphous standards "require[] great care to avoid abuse."[6] Gerald S. Reamey, New Jersey v. T.L.O.*: The Supreme*

_____

§ 10.11(a), at 593–97 (5th ed. 2012), [hereinafter LaFave]. According to LaFave, the doctrine "is frequently used only as a slogan" and has become "a substitute for analysis." LaFave, § 10.11(a), at 597. Yet, in *Vernonia* and in *Earls* the Supreme Court, while not reestablishing the applicability of *in loco parentis* to school searches, nonetheless emphasized the role of educational institutions as guardians and providers of tutelage. *See Earls*, 536 U.S. at 830–31, 122 S. Ct. at 2565, 153 L. Ed. 2d at 745; *Vernonia*, 515 U.S. at 665, 115 S. Ct. at 2396, 132 L. Ed. 2d at 582.

[5]While this lessened expectation of privacy has been applied by the Supreme Court in the context of random drug testing of student athletes, the search of the blue backpack within Lindsey's equipment bag is arguably distinguishable as it does not implicate exposures of the body so central in the *Vernonia* analysis and, additionally, involves a particularized individual search under *T.L.O.* and not a generalized search.

[6]*See Jenkins v. Talladega City Bd. of Educ.*, 115 F.3d 821, 827 (11th Cir. 1997) ("[N]ot only does the language used by the [*T.L.O.*] Court to announce a legal standard regarding the permissible scope of a reasonable school search lack specificity but, it appears, purposefully so." (Footnote omitted.)); *Williams v. Ellington*, 936 F.2d 881, 886 (6th Cir. 1991) (noting that the reasonableness standard of *T.L.O.* has left courts "either reluctant or unable to define what type of official conduct" is prohibited). The amorphous and open-ended nature of the *T.L.O.* analysis has been frequently noted in the academic literature. *See* Neal I. Aizenstein, Casenote, *Fourth Amendment—Searches by Public School Officials Valid on 'Reasonable Grounds'*, 76 J. Crim. L. & Criminology 898, 923 (1985) (noting the reasonable grounds standard lacks authority and promotes inconsistency in caselaw); David C. Blickenstaff, *Strip Searches of Public School Students: Can* New Jersey v. T.L.O. *Solve the Problem?*, 99 Dick. L. Rev. 1, 44–45 (1994)

*Court's Lesson on School Searches,* 16 St. Mary's L.J. 933, 948–49 (1985). We recognize the importance of ensuring that the *T.L.O.* test is not applied in a fashion to give school authorities a carte blanche in all settings and circumstances. Yet, we also recognize that under *T.L.O.*, the Supreme Court has moved away from a rule-based search and seizure jurisprudence toward a case-by-case method that will often turn on a careful and meticulous analysis of the facts of the case. *See Konop ex rel. Konop v. Nw. Sch. Dist.*, 26 F. Supp. 2d 1189, 1196 (D.S.D. 1998) (noting that the *T.L.O.* holding is "difficult in its application" because of its fact intensive nature).

Recognizing the difficulties, we nonetheless reach the conclusion that the seizure and search in this case met *T.L.O.* standards. We reach this conclusion because the seizure of Lindsey's bag was not based merely on his history of involvement with drugs and guns or merely upon somewhat suspicious or ambiguous furtive gestures. While there is substantial caselaw, for instance, that furtive gestures alone may not be enough to justify a search or seizure of a student bag, most of the cases with a combination of history and suspicious actions on the part of the student sustain such government action. It may be under some

---

(noting differences among courts in applying *T.L.O.* standards to strip searches); Martin R. Gardner, *Student Privacy in the Wake of* T.L.O.*: An Appeal for an Individualized Suspicion Requirement for Valid Searches and Seizures in the Schools*, 22 Ga. L. Rev. 897, 920 (1988) [hereinafter Gardner] (noting the abandonment of rule-based search and seizure jurisprudence for a case-by-case analysis of reasonableness); Sunil H. Mansukhani, *School Searches After* New Jersey v. T.L.O.*: Are There Any Limits?*, 34 U. Louisville J. Fam. L. 345, 360–61 (1996) (noting *T.L.O.*'s reasonableness standard fails to provide clear test); Stephen F. Shatz et al., *The Strip Search of Children and the Fourth Amendment*, 26 U.S.F. L. Rev. 1, 9 (1991) (noting vague reasoning and a lack of stated standards in *T.L.O.*). Given the nature of the test, we recognize the words of caution of Judge Posner that "[t]here is almost no legal outcome that a really skillful legal analyst cannot cover with a professional varnish." Richard A. Posner, *Foreward: A Political Court,* 119 Harv. L. Rev. 31, 52 (2005).

circumstances that mere history or questionable behavior or conduct is not enough to support a search.  But here, *both* history and suspicious conduct are present.  *See R.B. v. State,* 975 So. 2d 546, 548 (Fla. Dist. Ct. App. 2008) (holding a history of drug use and a furtive gesture provided sufficient suspicion to justify a search).

Further, the suspicious statement here was not in any way caused by school officials but was volunteered by Lindsey.  This is not a case where a student, in response to an action by school officials, seeks to prevent a threatened invasion of privacy as occurred in *In re William G.,* 709 P.2d at 1289; *see also State v. Zelinske,* 779 P.2d 971, 975 (N.M. Ct. App. 1989) (stating refusal to consent cannot authorize a warrantless search), *overruled on other grounds by State v. Bedolla,* 806 P.2d 588, 595 (N.M. Ct. App. 1991); *State v. Gilmour,* 901 P.2d 894, 896 (Or. Ct. App. 1995) (noting that "if both consent *and* refusal to consent provided bases for officers to conduct searches, there would be no circumstances under which officers could *not* search").  According to Stanton, Lindsey— when on his back at the football field—volunteered the words to the effect of "please make sure that Keota gets my bag."  Stanton further reported that Lindsey said, "Don't let anybody but Keota have my bag."  Coach Steffen largely confirmed Stanton's account, noting that Lindsey "was pretty concerned about his bag and making sure that . . . a certain kid would get the bag for him and that nobody would mess with it."  As noted by Steffen, Lindsey's unprompted concern about his bag "raised a red flag."

Unlike in *In re William G.* or the consent cases, here the student affirmatively and without any prompting by school officials made his request that responsibility for his bag be given to a specific student.  His comments were not designed to prevent officials from taking action, but

were instead an affirmative request that officials hand over his bag to a specific student. Under the circumstances, Lindsey's statements sought to control who gained possession of his bag, but did not assert privacy rights against an imminent threat of government intrusion as in *In re William G. See* 709 P.2d at 1289.

Additionally, the request was not a mildly suspicious comment with lots of alternative innocuous explanations like when a student asks to retrieve a temporarily impounded bag at the administration office. *See T.S.*, 100 So. 3d at 1290; *see also S.V.J.*, 891 So. 2d at 1222. Given Lindsey's potentially serious injury on the football field, it was truly odd for him to be worried about who grabbed his equipment bag to return it to school. Lindsey's volunteered request raised eyebrows considering his history of drug abuse and firearm violations.

Under *T.L.O.*, the standard generally applicable to support a particularized search or seizure of a student bag is not probable cause. 469 U.S. at 341, 105 S. Ct. at 742, 83 L. Ed. 2d at 734. Instead, a search or seizure must be reasonable under the circumstances. *Id.* As the Court later stressed in *Redding*, there must be at least "a moderate chance of finding evidence of wrongdoing." 557 U.S. at 371, 129 S. Ct. at 2639, 174 L. Ed. 2d at 362 (majority opinion).

Although drawing the line between a hunch and reasonable suspicion as required is often difficult, we conclude that in this case school officials were operating on a " 'common-sense conclusio[n] about human behavior' upon which 'practical people'—including government officials—are entitled to rely." *T.L.O.*, 469 U.S. at 346, 105 S. Ct. at 745, 83 L. Ed. 2d at 737 (quoting *Cortez*, 449 U.S. at 418, 101 S. Ct. at 695, 66 L. Ed. 2d at 629). When Lindsey, a person who had been suspended from school for drug activity and had firearm charges in the past,

expressed unprompted and unusual concern about his equipment bag when lying on the football field with a potentially serious injury, school authorities reasonably saw at least a yellow flag, if not a red flag, indicating there was a fair chance that this troubled youth had drugs or guns in the equipment bag.

3. *Scope of search.* We now turn to the question of the reasonableness of the scope of the search. Under applicable federal law, a search is permissible in scope "when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342, 105 S. Ct. at 743, 83 L. Ed. 2d at 735. As indicated above, school authorities had sufficient reason to believe the equipment bag might contain drugs or a gun based on Lindsey's history of involvement in drugs and guns and his curious concern about the equipment bag when immobilized on the football field with a potentially serious injury. When the school officials opened the bag and found another bag within, it was reasonable for school officials to look in the second bag since drugs or guns could reasonably be stored in it. Further, the fact the superintendent heard a loud thud when the bag hit the floor while the superintendent was preparing to conduct the search provided an additional reason to search in the second bag. The search was not excessively intrusive in light of the objectives of the search.

It is, of course, true that the search and seizure led to the discovery of a gun in the blue backpack. Lindsey claims that the loud clunk when the equipment bag hit the floor was hardly cause for thinking a gun was within the bag and that any such conclusion would be a wildly speculative hunch, not reasonable suspicion. The State's alternative stand-alone argument is that even if there was not reasonable

suspicion to search the equipment bag based on the statements by Lindsey, the loud clunk—when combined with knowledge of Lindsey's past involvement with guns—gave school authorities sufficient particularized suspicion at that time to search the equipment bag. The school superintendent, who owned a handgun, claimed that after he heard the noise he was "one hundred percent certain it was a gun."

The parties have cited no authority with similar facts. We have uncovered one case that is somewhat instructive. In *In re Gregory M.*, a school security officer heard a metallic thud when a student put a bag down on a shelf. 627 N.E.2d 500, 501 (N.Y. 1993). The security guard proceeded to feel the outside of the bag, which revealed a gun-like object in the bag. *Id.* A school official then opened the bag and found the gun. *Id.* The New York court concluded that based solely on the metallic thud, the security officer did not have reasonable suspicion under *T.L.O.* to search the bag but that a feel of the outside of the bag was a minimal intrusion that was reasonable even with the lack of particularized reasonable suspicion and was supportable under *T.L.O.* *Id.* Once the security officer felt the contours of the gun-like object, the security officer then at that point had sufficient particularized suspicion to support the further search of the bag. *Id.*

In light of our resolution of this case, however, we need not reach the issue of whether the loud thud was an insufficient basis for the search or was fruit of an unlawful seizure. Instead, we conclude that reasonable suspicion under *T.L.O.* existed prior to the loud thud and that the loud thud merely provided additional reason to press the search into the blue backpack contained within the equipment bag.

4. *Applicability of analysis under the Iowa Constitution.* In this case, Lindsey cites both the Fourth Amendment and article I, section 8 of

the Iowa Constitution in support of his claim. A conclusory reference to the Iowa Constitution was raised below. On appeal, however, Lindsey agrees that the standard established by *T.L.O.* and its progeny provide the relevant framework for analysis under the Iowa Constitution.[7] Because Lindsey has not suggested an independent standard under the Iowa Constitution, we apply the federal framework for the purpose of this case but reserve the right to apply that framework in a fashion different from federal caselaw. *State v. Lyle,* 854 N.W.2d 378, 383–84 (Iowa 2014); *State v. Pals*, 805 N.W.2d 767, 771–72 (Iowa 2011); *State v. Bruegger*, 773 N.W.2d 862, 883 (Iowa 2009).

Obviously, the standard of reasonability is not a verbal formula that lends itself "to easy quantification, clear classification, or easily administered criteria." Barry C. Feld, T.L.O. *and* Redding*'s Unanswered (Misanswered) Fourth Amendment Questions: Few Rights and Fewer Remedies*, 80 Miss. L.J. 847, 896 (2011).[8] Indeed, in *T.L.O.* itself, the New Jersey Supreme Court—where the case originated—used a standard very similar to that ultimately approved in *T.L.O.* 469 U.S. at 343, 105 S. Ct. at 743–44, 83 L. Ed. 2d at 736; *see State in re T.L.O.,* 463 A.2d 934, 942 (N.J. 1983)*, rev'd, T.L.O.,* 469 U.S. at 348, 105 S. Ct. at 746, 83 L. Ed. 2d at 738. The United States Supreme Court, however, viewed the New Jersey court's application as manifesting a "crabbed notion of

---

[7]Lindsey does not cite, for instance, the dissents in *T.L.O.*, courts of other states relying upon independent analysis of search and seizure requirements under state constitutions, or academic criticism of *T.L.O.* and its progeny.

[8]For criticism of reasonability and balancing tests in search and seizure, see Anthony G. Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn. L. Rev. 349, 393–95 (1974) (critiquing reasonableness and balancing), and Gardner, 22 Ga. L. Rev. at 919–25. *See also State v. Short,* 851 N.W.2d 474, 485–86 (Iowa 2014).

reasonableness." *T.L.O.*, 469 U.S. at 343, 105 S. Ct. at 744, 83 L. Ed. 2d at 736.

In this case, the parties have litigated within the framework of federal caselaw. We find the search falls within the general parameters of reasonableness as outlined in *T.L.O.* Under our cases, when a party does not present an independent standard under Iowa law, we may still apply the federal standard more stringently than the federal caselaw. But the standard for whether the search of Lindsey's equipment bag and the backpack within it was constitutionally permissible is whether the search has a moderate chance of uncovering wrongdoing. We think that standard was met. In this case we thus do not find an independent violation of article I, section 8 of the Iowa Constitution.[9]

### IV. Conclusion.

For all the above reasons, the judgment of the district court is affirmed.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

All justices concur except Mansfield and Waterman, JJ., who concur specially, and Wiggins, J., who dissents.

---

[9]Other states have found independent violations of the right to be free from unreasonable searches and seizures under their state constitutions. For instance, the Oregon Supreme Court has emphasized that under article I, section 9 of the Oregon Constitution, the privacy protected "is not privacy that one reasonably *expects* but the privacy to which one has a *right.*" *See State ex rel. Juvenile Dep't of Clackamas Cty. v. M.A.D.*, 233 P.3d 437, 441 (Or. 2010) (en banc) (quoting *State v. Howard*, 157 P.3d 1189, 1193 (Or. 2007)).

**MANSFIELD, Justice (concurring specially).**

I join the court in affirming Lindsey's conviction and sentence and the denial of his motion to suppress. I also join the court's opinion subject only to the following exception.

I do not agree that an argument under article I, section 8 of the Iowa Constitution has been preserved. It is true that Lindsey's motion to suppress did mention "the Iowa Constitution" once (although not article I, section 8). However, the district court's ruling cited only the Fourth Amendment, and Lindsey did not seek to expand that ruling. Moreover, on appeal Lindsey mentioned article I, section 8 only twice in passing in his brief and did nothing to develop a state constitutional argument. Further, at oral argument before the court of appeals, Lindsey's counsel conceded that Lindsey's appeal could be resolved "by examining the Fourth Amendment exclusively." Consequently, the court of appeals did not consider article I, section 8. And in oral argument before our court, nobody talked about the Iowa Constitution. This can be verified by listening to the publicly available recording. Accordingly, I concur in the judgment and in the court's opinion except as noted here.

Waterman, J., joins this special concurrence.

#14–0773, *State v. Lindsey*

**WIGGINS, Justice (dissenting).**

As the majority acknowledges, the federal standard that determines whether the search of the equipment bag violated the Fourth Amendment is the one set forth in *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S. Ct. 733, 83 L. Ed. 2d 720 (1985) and *Safford Unified School District No. 1 v. Redding*, 557 U.S. 364, 129 S. Ct. 2633, 174 L. Ed. 2d 354 (2009). For evidence obtained by public school officials to be admissible under the Fourth Amendment, the search or seizure by which it was obtained must have been "justified at its inception" because the officials had "reasonable grounds" to suspect it would produce evidence of violations of the law or school rules. *T.L.O.*, 469 U.S. at 341–42, 105 S. Ct. at 742–43, 83 L. Ed. 2d at 734–35 (quoting *Terry v. Ohio*, 392 U.S. 1, 20, 88 S. Ct. 1868, 1879, 20 L. Ed. 2d 889, 905 (1968)). More specifically, *before* initiating the search or seizure, officials must have had sufficient reliable knowledge to support a reasonable belief they had a "moderate chance" of discovering evidence of wrongdoing. *Redding*, 557 U.S. at 370–71, 129 S. Ct. at 2639, 174 L. Ed. 2d at 361–62. When school officials claim a search or seizure was justified based on individualized suspicion of a particular student, the court must assess whether they had sufficient reliable information to support such a belief concerning the particular student before the search or seizure occurred. *Id.* at 373–74, 129 S. Ct. at 2641, 174 L. Ed. 2d at 363.

In holding the search and seizure of Lindsey's equipment bag was justified at its inception, the majority concludes school officials were justified in believing they had a moderate chance of discovering evidence of wrongdoing inside it based on just two facts. First, the superintendent knew Lindsey had a history of drug and gun infractions. Second, after

being badly injured during a football game, Lindsey repeatedly requested that the superintendent give his equipment bag to one of his friends on the team and not to let anyone else mess with it as he was being prepped for transport via ambulance.[10]

In my view, the majority fixates on Lindsey's past to incorrectly conclude this reasonably innocuous conduct was actually suspicious conduct. Consequently, the majority concludes reasonably innocuous conduct created the reasonable suspicion necessary to justify the search and seizure of the bag under *T.L.O.* and *Redding*. In contrast, for the following reasons, I believe school officials had inadequate reasonably reliable information to believe they had a moderate chance of finding evidence of wrongdoing inside the equipment bag at the moment they seized it.

First, the majority asserts the request Lindsey made to the superintendent was "truly odd" in light of his serious injury and not merely "a mildly suspicious comment with lots of alternative innocuous explanations." I disagree with this assessment. Nothing about the request Lindsey made or the manner in which he made it amounted to "suspicious conduct" under the circumstances.

As the Supreme Court has recognized, "schoolchildren may find it necessary to carry with them a variety of legitimate, noncontraband items . . . onto school grounds." *T.L.O.*, 469 U.S. at 339, 105 S. Ct. at 741, 83 L. Ed. 2d at 733. This legitimate need is in no way diminished when students participate in school activities on school grounds. In that

---

[10]Despite the quotes used in the majority and concurring opinions, the superintendent testified that he did not remember the statements Lindsey made well enough to quote them. When asked what the gist of the statements Lindsey made was, he replied: "It was just like I said, please make sure that Keota gets my bag. Please make sure that nobody else gets my bag."

context, students may need to transport "not only the supplies needed for their studies, . . . keys, money, and the necessaries of personal hygiene and grooming," but also "articles of property needed in connection with extracurricular or recreational activities." *See id.* Along with such necessary items, students may have perfectly legitimate reasons to carry with them "nondisruptive yet highly personal items as photographs, letters, and diaries." *Id.*

In today's world, I would add cellphones, tablets, and laptops to the list of items students may legitimately carry on school grounds. Among high schoolers today, cell phones are particularly ubiquitous. *Cf. Riley v. California*, 573 U.S. ___, ___, 134 S. Ct. 2473, 2490, 189 L. Ed. 2d 430, 447 (2014). As the Supreme Court has noted, cell phones ordinarily contain "vast quantities of personal information." *Id.* at ___, 134 S. Ct. at 2485, 189 L. Ed. 2d at 442. Thus, many high schoolers ordinarily keep on their person or among their belongings on school grounds "a digital record of nearly every aspect of their lives—from the mundane to the intimate." *Id.* at ___, 134 S. Ct. at 2490, 189 L. Ed. 2d at 447.

I think the majority is incorrect to assert that Lindsey asking the superintendent to give his equipment bag to his friend and make sure nothing happened to it amounted to "suspicious conduct." This is particularly true in light of the fact that Lindsey had placed his backpack in his equipment bag at least for the duration of the football game. Quite simply, it appears that everything Lindsey had with him—his backpack, schoolbooks, homework, clothes, shoes, wallet, cash, keys, cellphone, etc.—was in his equipment bag when he was injured. Accordingly, in my view it would have been odd if Lindsey had *not* been concerned about what would happen to his equipment bag upon learning he had been

potentially severely injured and was being transported to the hospital. Whatever the equipment bag contained, it would have been perfectly natural for *any* high school student in his situation to want to ensure it was shielded from theft or intrusion and safely returned. Even setting aside the potentially vast quantity of personal information the equipment bag may have contained, its contents were also likely worth a great deal of money, particularly in the eyes of a high schooler.

Additionally, upon assessing the injury Lindsey suffered during the football game, the ambulance attendants placed Lindsey into a cervical collar and onto a backboard to prevent his further injury. Thus, it was hardly "suspicious conduct" suggestive of wrongdoing for Lindsey to repeat his request that his equipment bag be given to his friend or fail to appreciate the potential seriousness of his injury. Given the nature of his probable injury and the context in which it occurred,[11] school officials reasonably should have understood it was unlikely Lindsey was thinking clearly before he was transported to the hospital.

In short, Lindsey making the statements he made under the circumstances in which he made them did not amount to "suspicious conduct." Therefore, I conclude school officials lacked any reliable basis upon which to form a reasonable suspicion that Lindsey was engaged in wrongdoing before he was loaded into the ambulance.

Because the statements Lindsey made before he was loaded onto the ambulance could not reasonably have been perceived to be suspicious under the circumstances, the only basis school officials had for suspecting he might have been engaged in wrongdoing while he was

---

[11]Football is a contact sport widely acknowledged to be associated with concussions and head injuries.

being cared for on the field was his past conduct.  Standing alone, this was insufficient to justify a reasonable belief that officials had a "moderate chance" of discovering evidence of wrongdoing inside his equipment bag.  And at bottom, Lindsey's history is really all the majority relies upon to find reasonable suspicion existed in this case.  The majority opinion all but admits that, were it not for his past suspension for drug activity and past firearm charges, school officials would not have reasonably seen a yellow flag or a red flag when Lindsey sought to ensure his equipment bag was delivered to his friend.  In the majority's view, merely because he had been in trouble before, Lindsey's being concerned about what happened to his belongings somehow indicated there was a "fair chance that this troubled youth had drugs or guns in the equipment bag."

Second, the majority supplies no adequate basis for its conclusion the affirmative requests Lindsey made were not an assertion of his constitutional right to be free from unreasonable searches and seizures without a warrant.  There can be no denying Lindsey had an absolute right to assert his constitutional right to be free from an unreasonable search or seizure of his equipment bag without a warrant until school officials actually had reasonable suspicion to search or seize it.  Lindsey had the ability to affirmatively assert that right at least until reasonably reliable information indicated school officials had a moderate chance of discovering evidence he was engaged in wrongdoing, even if he ultimately perceived a threat to his privacy at the hands of school officials only after being injured on the football field.  Yet the majority suggests the validity of any assertion of that right Lindsey might have attempted to make turns on whether school officials "caused" him to make it by affirmatively threatening to invade his privacy.  I believe the majority is incorrect to

distinguish the requests Lindsey made from an assertion of a constitutional right on the ground that he "volunteered" them.

Instead of engaging with the content of the statements Lindsey made, the majority places too great an emphasis on the context in which he made them. On the content front, the majority analysis is thin. The majority asserts what Lindsey said did not amount to an assertion of a constitutional right in part because his statements "were not designed to prevent officials from taking action, but were instead an affirmative request that officials hand over his bag to a specific student." But if the statements Lindsey made were not designed to prevent officials from searching his equipment bag, why were they so suspicious? And when Lindsey instructed school officials as to what he wanted done with his equipment bag, by implication did he not also instruct them as to what he did not want done with it? The majority simply fails to explain what distinguishes the "affirmative request" Lindsey repeatedly made from an effective assertion of his constitutional right not to have school officials search or seize his equipment bag without a warrant.

Two potentially troubling implications follow from the majority analysis. First, the majority opinion suggests a student may invoke the right to be free from unreasonable warrantless searches and seizures only after school officials explicitly threaten to invade his or her privacy. Second, the majority opinion suggests that for a student to effectively assert the right to be free from unreasonable warrantless searches and seizures against school officials, only an explicit assertion expressed in precise terms will do.

The majority implicitly acknowledges that, if the statements Lindsey made amounted to an assertion of a constitutional right, the search was unconstitutional. As the majority opinion recognizes,

> There are many reasons why a student might assert these rights, other than an attempt to prevent disclosure of evidence that one has violated a proscribed activity. A student cannot be penalized for demanding respect for his or her constitutional rights.

*In re William G.*, 709 P.2d 1287, 1297–98 (Cal. 1985) (en banc). Nonetheless, the majority declines to provide any meaningful guidance as to just how explicit an assertion of the right to be free from unreasonable searches and seizures must be in order to be effective in this context. In contrast, in *In re Warren G.*, the California Supreme Court concluded that right to be adequately invoked whenever a student attempts to shield a private possession from school officials:

> If a student's limited right of privacy is to have any meaning, his attempt to exercise that right—by shielding a private possession from a school official's view—cannot in itself trigger a "reasonable suspicion." A contrary conclusion would lead to the anomalous result that a student would retain a right of privacy only in those matters that he willingly reveals to school officials.

*Id.* Thus, if Lindsey instructed school officials to give the equipment bag to his friend because he desired to shield it from them, he arguably asserted his constitutional right to be free from unreasonable searches and seizures without a warrant.

Because I part ways with the majority on the question of whether the statements Lindsey made could have created reasonable suspicion in the minds of school officials who knew about his past conduct, I need not delve further into the question of whether his statements amounted to an assertion of his right to be free from unreasonable searches or seizures without a warrant. That is because school officials seized the equipment bag when they declined to heed Lindsey's requests that it be given to his trusted friend and teammate.

When the head coach carried the equipment bag onto the bus back to Dunkerton and placed it onto the seat next to his wife, knowingly disregarding the requests Lindsey made, the bag was unquestionably seized within the meaning of the Fourth Amendment. "A seizure occurs even when an unintended person or thing is the object of the detention or taking, but the detention or taking itself must be *willful*." *Brower v. County of Inyo*, 489 U.S. 593, 596, 109 S. Ct. 1378, 1381, 103 L. Ed. 2d 628, 635 (1989) (emphasis added) (citations omitted). In this case, the facts clearly indicate the coach *willfully* grabbed the equipment bag and withheld it from the person Lindsey intended it to be entrusted to because the superintendent asked him to. Indeed, there is no question the coach knew Lindsey did not *want* him to transport the equipment bag back to Dunkerton himself, as he personally heard Lindsey ask that it be given to his friend instead.

As a result, by the time the superintendent heard the metallic sound coming from within the equipment bag in the lunchroom back in Dunkerton, the bag had already been seized within the meaning of the Fourth Amendment. It therefore makes no difference whether the superintendent reasonably believed the sound he heard was created by a firearm coming into contact with the floor through the fabric of the bag or not. Because the seizure of the equipment bag was not adequately justified at the moment of its inception, the ensuing search of the bag was unreasonable within the meaning of the Fourth Amendment, and the fruits of that search should have been suppressed. I would therefore reverse the judgment of conviction and remand for a new trial.